No. 22-1557

# In The United States Court of Appeals For the Seventh Circuit

PATRICK ATKINSON,

Plaintiff-Appellant,

v.

MERRICK GARLAND, in his official capacity as Attorney General of the United States, and MARVIN RICHARDSON, in his official capacity as Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives,

Defendants-Appellees.

---

Appeal from a Judgment of the United States District Court
for the Northern District of Illinois
The Hon. John Robert Blakey, District Judge
Case No. 1:21-CV-291

---

APPELLANTS' BRIEF AND REQUIRED SHORT APPENDIX

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
430 West Roosevelt Road
Wheaton, IL 60187
630.452.4547/630.596.4445 Fax
dsigale@sigalelaw.com

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-1557

Short Caption: Patrick Atkinson v. Merrick Garland, in his official capacity, et al

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Patrick Atkinson

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Law Firm of David G. Sigale, P.C.

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: /s/ David G. Sigale     Date: April 8, 2022

Attorney's Printed Name: David G. Sigale

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** [✔]     **No** [ ]

Address: 430 West Roosevelt Road, Wheaton, IL 60187

Phone Number: 630.452.4547     Fax Number: 630.596.4445

E-Mail Address: dsigale@sigalelaw.com

rev. 12/19 AK

✔

# CERTIFICATE OF SERVICE

**Certificate of Service When All Case Participants Are CM/ECF Participants**

I hereby certify that on _____April 8, 2022_____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ _David G. Sigale_____

# CERTIFICATE OF SERVICE

**Certificate of Service When Not All Case Participants Are CM/ECF Participants**

I hereby certify that on _____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

counsel / party:                                    address:

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

s/_____

# TABLE OF CONTENTS

Table of Contents ............................................................... i

Table of Authorities ........................................................ iii

Jurisdictional Statement ................................................... 1

Statement of Issues ........................................................ 2

Statement of the Case ..................................................... 3

    The Challenged Statute ........................................... 4

    Procedural History ................................................. 5

    The District Court's Decision .................................. 5

Summary of Argument .................................................... 5

Argument................................................................... 7

I.    THE COURT'S REVIEW IS DE NOVO.................................. 7

    Standard for Reviewing an F.R.Civ.P. 12(b)(6) Motion ....... 7

II.   *HELLER'*S PRESUMPTIVELY VALID FELON FIREARM BAN MEANS THAT SOME FELONS MUST BE MUST BE ABLE TO OVERCOME THE PRESUMPTION ....................................... 9

III.  PLAINTIFF'S COMPLAINT SHOULD NOT HAVE BEEN DISMISSED, AS PLAINTIFF SHOULD HAVE BEEN GIVEN THE OPPORTUNITY TO SHOW HE IS OUTSIDE THE CONFINES OF *KANTER* ....................................…........... 20

i

IV.   *KANTER* WAS WRONGLY DECIDED AND LED THE
       DISTRICT COURT TO AN INCORRECT CONCLUSION ......... 37

       A.   Dangerousness Is Meant To Be the Touchstone of
            Individual Firearm Bans ............................................ 38

       B.   The "Virtuous Citizen" Test Is Not A Part of the Second
            Amendment. ............................................................. 53

CONCLUSION ............................................................................ 62

# TABLE OF AUTHORITIES

*Cases*

*Abcarian v. McDonald,*
    617 F.3d 931 (7th Cir. 2010) .................................................... 7

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................. 8

*Atwater v. City of Lago Vista,*
    532 U.S. 318 (2001) ............................................................ 42

*Ayotte v. Planned Parenthood of N. New England,*
    546 U.S. 320 (2006) ........................................................... 36

*Baer v. Lynch,*
    636 F. App'x 695 (7th Cir. 2016) ......................................... 17

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................. 8

*Binderup v. Att'y Gen. United States of Am.,*
    836 F.3d 336 (3d Cir. 2016) .............. 11, 14, 24, 26, 28, 35, 44,
                                            45, 46, 47, 48, 53, 57

*Bliss v. Commonwealth,*
    2 Lit. 90 (1822, Ky.) ......................................................... 57

*Borden's Farm Products Co. v. Baldwin,*
    293 U.S. 194 (1934) ........................................................... 11

*Cohens v. Virginia,*
    19 U.S. 264 (1821) ............................................................. 59

iii

*Cont'l Cas. Co. v. Staffing Concepts, Inc.*,
    538 F.3d 577 (7th Cir. 2008) ................................................. 13

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) …….................................... 3, 6, 10, 11, 20, 21,
                                  24, 28, 38, 45, 50

*Erickson v. Pardus*,
    551 U.S. 89 (2007) ............................................................... 8

*Evans v. Cook County State's Attorney*,
    2021 IL 125513 ................................................................... 10

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ..................................... 16, 23, 24

*Folajtar v. AG of the United States*,
    980 F.3d 897 (3rd Cir. 2020) ........................... 34, 41, 44, 45,48

*Fortson v. L.A. City Attorney's Office*,
    852 F.3d 1190 (9th Cir. 2017) ...................................... 14

*Hatfield v. Barr*,
    925 F.3d 950 (7th Cir. 2019) ...................................... 3, 15, 26

*Illinois v. Lidster*,
    540 U.S. 419 (2004) ............................................................ 59

*Landmark Am. Ins. Co. v. Hilger*,
    838 F.3d 821 (7th Cir. 2016) ................................................ 7

*Kanter v. Barr*,
    919 F.3d 437 (7th Cir. 2019) ........................... 3, 15, 16, 17, 27,
                     9, 30, 35, 39, 40, 41, 43, 48, 49, 50, 53, 57

iv

*Logan v. United States*,
552 U.S. 23 (2007) ............................................................... 12

*Marquez v. Weinstein, Pinson & Riley, P.S.*,
836 F.3d 808 (7th Cir. 2016) ………………………….…..…. 7

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ......................................... 9, 20, 38

*McCready v. eBay, Inc.*,
453 F.3d 882 (7th Cir. 2006) ………………….…..………… 7

*Medina v. Whitaker*,
913 F.3d 152 (D.C. Cir. 2019) ………………………..........18, 25

*Moore v. Madigan*,
702 F.3d 933 (7th Cir. 2012) ………………….…..……… 23

*Nunn v. State*,
(1 Ga.) 1 Kel. 243 (1846) ...................................... 58

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979) ……………………………….…..… 59

*Rummel v. Estelle*,
445 U.S. 263 (1980) ...................................... 45

*Scarborough v. United States*,
431 U.S. 563 (1977) ……………………………… 52, 53

*Silvester v. Becerra*,
138 S. Ct. 945 (2018) ……………………………..….… 9

*Sir John Knight's Case*,
87 Eng. Rep. 75 (K.B. 1686) …………………………… 40

*Tamayo v. Blagojevich,*
 526 F.3d 1074 (7th Cir. 2008) ................................................. 9

*United States v. Barton,*
 633 F.3d 168 (3d Cir. 2011) .................................................... 22, 24

*United States v. Bass*,
 404 U.S. 336 (1971) .............................................................. 51

*United States v. Booker,*
 644 F.3d 12 (1st Cir. 2011) ................................................... 52

*United States v. Chovan,*
 735 F.3d 1127 (9th Cir. 2013) ............................................... 47

*United States v. Everist,*
 368 F.3d 517 (5th Cir. 2004) ................................................. 18

*United States v. Marcavage,*
 609 F.3d 264 (3rd Cir. 2010) ................................................ 35

*United States v. Shields*,
 789 F.3d 733 (7th Cir. 2015) ................................................. 17

*United States v. Skoien,*
 614 F.3d 638 (7th Cir. 2010) (*en banc*) ................................17

*United States v. Torres,*
 789 Fed. Appx. 655 (9th Cir. 2020) .......................................11

*United States v. Torres-Rosario,*
 658 F.3d 110 (1st Cir. 2011) ................................................. 13

*United States v. Vongxay,*
 594 F.3d 1111 (9th Cir. 2010) ......................................... 18, 28

*United States v. Williams*,
    616 F.3d 685 (7th Cir. 2010) ....................................... 11, 15, 17

*United States v. Woolsey*,
    759 F.3d 905 (8th Cir. 2014) ................................................ 14

*United States v. Yancey*,
    621 F.3d 681 (7th Cir. 2010) .................................…. 51, 54, 58

*United States v. Yang*,
    799 F.3d 750 (7th Cir. 2015) ................................................ 60

*Wigod v. Wells Fargo Bank, N.A.*,
    673 F.3d 547 (7th Cir. 2012) ................................................. 8

*Wisehart v. Davis*,
    408 F.3d 321 (7th Cir. 2005) ................................................ 59

*Wrenn v. District of Columbia*,
    864 F.3d 650 (D.C. Cir. 2017) ................................….. 38

**Constitutional Provisions**

U.S. Const. amend. II .............................................................. 20

**Statutes, Rules, and Ordinances**

18 U.S.C. § 921(a)(20) ........................................................ 4, 58

18 U.S.C. § 922(g)(1) ................................................................ 4

18 U.S.C. § 1464 ......................................................….... 44

An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342,
    75 Stat. 757 (1961); H.R. Rep. No. 87-1202 (1961) .................. 52

Federal Firearms Act, ch. 850, §§ 1(6), 2(f),
Pub. L. No. 75-785, 52 Stat. 1250 (1938) ................................... 52

Omnibus Crime Control and Safe Streets Act of 1968,
Pub. L. No. 90-351, tit. VII, § 1202, 82 Stat. 197 ..................... 53

Fed. R. Civ. P. 8(a)(2) .................................................................. 8

Fed. R. Civ. P. 12(b)(6) ................................................................ 7

430 ILCS 65/10 ....................................................................... 10

720 ILCS 5/2-8 ......................................................................... 10

1786 Mass. Laws 265 ............................................................... 49

N.J. Stat. Ann. § 2C:39-7 ........................................................ 45

N.J. Stat. Ann. §§ 2C:40-17(a) ................................................. 44

N.J. Stat. Ann. §§ 2C:43-6.a(3) ............................................... 44

18 Pa. Const. Stat. Ann. § 6105(b) ........................................... 45

18 Pa. Const. Stat. Ann. § 7613 ............................................... 44

## *Other Authorities*

Mark W. Bennett, Justin D. Levinson, & Koichi Hioki, *Judging
Federal White-Collar Fraud Sentencing: An Empirical Study
Revealing the Need for Further Reform*, 102 Iowa L. Rev.
939, 989 (2017) ............................................................. 46, 47

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139 (2007) ...... 40

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (1st ed. 1868) ............................................57

Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657 (2002) ...................................................…... 55, 56

Matthew R. Durose, *et al., U.S. Dep't of Justice, Bureau of Justice Statistics, Recidivism of Prisoner Released in 30 States in 2005: Patterns from 2005 to 2010*, at 9 (2014) ................................ 29

Michael Dalton, *The Country Justice* (1727) ..............................,,,,,... 42

Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 326 (2d ed. 1891) ... 41

G.A. Gilbert, *The Connecticut Loyalists*, 4 AM. HIST. REV. 273 (1899) ..........................................................................41

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 275–83 (2020) ............................................................ 39

1 Samuel Johnson, *A Dictionary of the English Language*, (5th ed. 1773) ................................................................. 42

Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143 (Winter 1986) ................................. 55, 56

Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204 (1983) ...... 55, 56

Gary Kleck, *Crime Control Through the Private Use of Armed Force*, Social Problems 35(l):1-21 (1988) ....................................... 32

Gary Kleck and Miriam DeLone, *Victim Resistance and Offender Weapon Effects In Robbery*, Journal of Quantitative Criminology 9(1):55-82 (1993) ............................................................... 32

Gary Kleck and Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, J. of Criminal Law and Criminology, v.86, n.1, pp.150-187 (1995) .... 30

Gary Kleck and Susan Sayles, *Rape and Resistance*, Social Problems 37(2):149-162 (1990) ........................................................... 32

C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695 (2009) ..................................... 40, 51

Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461 (1995) .............................................. 55, 56

Paul H. Robinson *et al.*, *The Modern Irrationalities of American Criminal Codes: An Empirical Study of Offense Grading*, 100 J. Crim. L. & Criminology 709 (2010) ................................. 44

Paul H. Robinson *et al.*, *Report on Offense Grading in New Jersey* (2011) .................................................................................. 44

2 Bernard Schwartz, *The Bill of Rights: A Documentary History*, 675 (1971) ................................................................... 42, 43

William J. Stuntz, *The Pathological Politics of Criminal Law*, 100 Mich. L. Rev. 505, 523-33, 536-37 (2001) .......................... 45

x

Jongyeon Tark and Gary Kleck. *Resisting Crime: The Effects of Victim Action on the Outcomes of Crimes.* Criminology, 42(4):861-909 (2004) ..................................................... 32, 33

Jennifer L. Truman, Ph.D., and Lynn Langton, Ph.D,. *Criminal Victimization, 2014.* U.S. Bureau of Justice Statistics. August, 2015, Revised September 29, 2015 ......................................... 31

Tueller, Dennis*, "How Close is Too Close," S.W.A.T. Magazine*, (March 1983) ..................................................................... 34

David Weisburd and Ellen Chayet, *White Collar Crime and Criminal Careers: A Final Report Submitted to the National Institute of Justice* (1993) .................................................................. 21

*U.S. Dep't of Justice, Bureau of Justice Statistics Profile of Nonviolent Offenders Exiting State Prisons* 2, 4 (2004) ............ 29

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant ("Plaintiff") seeks reversal of the District Court's grant of an F.R. Civ. P 12(b)(6) Motion to Dismiss in favor of the Defendants-Appellees (collectively, "Defendants"), and seek—under the Second and Fourteenth Amendments to the United States Constitution - declaratory judgment and a permanent injunction barring enforcement of 18 U.S.C. § 922(g)(1) as-applied to him individually - thus restoring Plaintiff's rights under the Second Amendment. The District Court had jurisdiction under 28 U.S.C. § 1331, 1343, 2201 and 2202.

This Court has jurisdiction under 28 U.S.C. § 1291 because the District Court rendered a final judgment granting the Defendants' F.R. Civ. P. 12(b)(6) Motion to Dismiss.

i.     The order sought to be reviewed was rendered March 15, 2022. *See* Short Appendix 1 ("SA"). The accompanying Opinion was issued on March 15, 2022.  SA2.

ii.     There were no other orders tolling the time in which to appeal.

iii.    The Notice of Appeal was filed April 5, 2022. SA23.

1.    Did the district court commit reversible error by dismissing the Plaintiff's Complaint after holding that Plaintiff, an individual convicted of a Class C non-violent federal felony, who committed the offense unknowingly, who was sentenced to two years of probation with six months of home confinement, a fine of $15,000.00, and 200 hours of community service, and who completed all his sentencing terms, and had his probation terminated a year early without objection from the Government more than twenty years ago, and who has lived a peaceful and law-abiding existence ever since, lies outside Second Amendment protection and cannot be afforded the opportunity to prove he deserves Second Amendment protection?

2.    Should this Court re-visit and overrule *Kanter v. Barr* and *Hatfield v. Barr* because the "virtuous citizen" standard for viewing felon disarmament laws is not supported by the historical record, and is far overbroad of the important and

pertinent question of dangerousness?

## STATEMENT OF THE CASE

On March 15, 2022, the District Court granted the Defendants'
F.R. Civ. P. 12(b)(6) Motion to Dismiss, holding that *Kanter v. Barr*, 919
F.3d 437 (7th Cir. 2019) and *Hatfield v. Barr*, 925 F.3d 950 (7th Cir.
2019) completely foreclosed his claim, even though both *Kanter* and
*Hatfield* recognized that some person's circumstances may allow that
person to bring a successful as -applied Second Amendment claim, and
even though Plaintiff was afforded no opportunity to prove that his as-
applied challenge to 18 U.S.C. § 922(g)(1) fell outside the
presumptively-lawful parameters as stated in *District of Columbia v.
Heller*, 554 U.S. 570, 626, fn.26 (2008), and that Plaintiff is a non-
dangerous person who deserves to have his Second Amendment rights
restored.

Because the District Court misinterpreted and misapplied *Kanter*,
and alternatively because *Kanter* itself applied standards that are
inconsistent with *Heller*, the dismissal of Plaintiff's Complaint must be
reversed.

3

## The Challenged Statute

18 U.S.C. § 922(g)(1) states as follows:

> (g) It shall be unlawful for any person—
>
> > (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;
>
> . . .
>
> > to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 921(a) states in relevant part:

> (20) The term "crime punishable by imprisonment for a term exceeding one year" does not include—
>
> > (A) any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices, or
> >
> > (B) any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.
> >
> > > What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. Any conviction which has been expunged, or set aside or for which a person has been pardoned or has

had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

## Procedural History

Plaintiff filed his Complaint in the District Court as Case No. 1:21-cv-291 on January 18, 2021. The Defendants moved to dismiss that complaint under F.R. Civ. P. 12(b)(6).

## The District Court's Decision

On March 15, 2022, the district court issued an Order granting Defendants' F.R. Civ. P. 12(b)(6) Motion to Dismiss Plaintiff's Complaint with prejudice (SA1). The district court issued an accompanying Opinion explaining its decision (SA2).

## SUMMARY OF ARGUMENT

The district court's dismissal is flawed in two fundamental respects: the district court committed reversible error by misinterpreting and misapplying the holdings in *Kanter* and *Hatfield*, and because *Kanter*'s standard of all-but-categorically barring non-violent felons from even seeking to have their Second Amendment

rights restored, no matter their individual circumstances, violates the Supreme Court's holding in *Heller*, 554 U.S. at 636, it was likewise error for the district court to apply those same incorrect standards.

The district court opinion is anchored on the holdings in *Kanter*. But the district court opinion surpasses even *Kanter* by simultaneously holding that (1.) Plaintiff is not entitled to any sort of evidentiary hearing to determine if he qualifies to have his rights restored, and (2.) based solely on the allegations in Plaintiff's Complaint, that he does not so qualify. This Court should reverse and remand this case to the district court so that, despite the expansive reach of *Kanter*, the Plaintiff may receive an opportunity to show the court that he falls outside of the presumptive ban described in *Heller*.

In addition to the above, *Kanter* itself was incorrectly decided, and thus did not mandate dismissal of Plaintiff's Complaint. It was improper in *Kanter* to base the decision on the "virtuous citizen" standard for determining the applicability of 18 U.S.C. § 922 (g)(1) to one making an as-applied Second Amendment claim, where that standard does not have historical support, and does not focus on the issue of whether someone is likely to more dangerous than any average

person enjoying Second Amendment rights. Such improprieties completely foreclose someone from attempting to overcome the presumptive ban referenced in *Heller*.

Despite this, the district court relied completely on the holding in *Kanter* in dismissing Plaintiff's Complaint. Based on the above-stated inconsistencies, this Court should revisit and replace *Kanter's* standard. And because *Kanter* was wrongly decided, the District Court in this matter was led astray.

ARGUMENT

## I. THE COURT'S REVIEW IS *DE NOVO*.

Because this Court reviews a judgment granting a motion to dismiss for failure to state a claim, this court reviews that judgment *de novo. See, e.g., Landmark Am. Ins. Co. v. Hilger*, 838 F.3d 821, 824 (7th Cir. 2016); *Abcarian v. McDonald*, 617 F.3d 931, 933 (7th Cir. 2010); *McCready v. eBay, Inc.*, 453 F.3d 882, 888 (7th Cir. 2006).

## Standard for Reviewing an F.R.Civ.P. 12(b)(6) Motion

Generally, a dismissal pursuant to Rule 12(b)(6) is appropriate only if there is no set of facts consistent with the pleadings under which the plaintiffs could obtain relief. *See Marquez v. Weinstein, Pinson &*

*Riley, P.S.*, 836 F.3d 808, 812 (7th Cir. 2016). The Court ". . . must accept as true all factual allegations in the complaint. *E.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 [ ].

Under the federal rules' notice pleading standard, a complaint must contain only a 'short and plain statement of the claim showing that the pleader is entitled to relief.' Fed. R. Civ. P. 8(a)(2). The complaint will survive a motion to dismiss if it 'contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662,___, [ ] (2009), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 [ ] (2007). 'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' *Id.*" *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 555 (7th Cir. 2012).

A well-pleaded complaint may proceed even if it appears "that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Bell Atlantic Corp.*, 550 U.S. at 556. The Court should construe the complaint in the light most favorable to the plaintiffs accepting as true all well-pleaded facts alleged, and drawing

all possible inferences in their favor. *See Tamayo v. Blagojevich*, 526

F.3d 1074, 1081 (7th Cir. 2008).

II.  **HELLER'S PRESUMPTIVELY VALID FELON FIREARM BAN MEANS THAT SOME FELONS MUST BE ABLE TO OVERCOME THE PRESUMPTION.**

In *Heller*, 554 U.S. at 634-35, the U.S. Supreme Court held that

the core of the Second Amendment is "the right of law-abiding,

responsible citizens to use arms in defense of hearth and home."

Two years after *Heller*, the Supreme Court reminded the lower

courts that the Second Amendment is not "a second-class right, subject

to an entirely different body of rules than the other Bill of Rights

guarantees." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)

(plurality opinion). Despite these rulings, in the years since *Heller* and

*McDonald* one has seen "the lower courts' general failure to afford the

Second Amendment the respect due an enumerated constitutional

right." *Silvester v. Becerra*, 138 S. Ct. 945 (2018) (Thomas, J.,

dissenting from den. of *certiorari*).

And while the recognition of the individual Second Amendment

right itself was the key holding of *Heller*, it was a passage within that

led to the issue of this appeal, and has led to the disenfranchisement of

Plaintiff, a non-violent federal[1] felon from long ago. As this Court noted

in *Kanter*, 919 F.3d at 441:

> The [*Heller*] Court also made clear that "the right
> secured by the Second Amendment is not unlimited."
> *Id.* at 626. Although the Court did not "undertake an
> exhaustive historical analysis ... of the full scope of the
> Second Amendment," it said that "nothing in [its]
> opinion should be taken to cast doubt on longstanding
> prohibitions on the possession of firearms by felons and
> the mentally ill." *Id.* It described such prohibitions as
> "presumptively lawful regulatory measures." *Id.* at 627
> n.26.

"Presumptions require an actor '[t]o take for granted as being true

in the absence of proof to the contrary' the matter presumed. American

Heritage Dictionary (5th ed. 2016) (definition of 'presume'). In other

words, presumptions may be rebuttable. While words in a judicial

opinion — as opposed to a statute — should not be scrutinized with a

gimlet eye, the Supreme Court's use of the word 'presumptively' in

*Heller* at least suggests that as-applied challenges based on the Second

---

[1] Had Plaintiff's felony conviction been in an Illinois state court, Plaintiff would have been able to immediately seek restoration of his firearm rights under Section 10 of the Illinois Firearm Owners Identification Act (430 ILCS 65/10). Even if his felony had been a violent "forcible felony" (as that term is defined in 720 ILCS 5/2-8), which it was not, he would still be able to seek restoration of his firearm rights after a wait of 20 years following the conviction or end of incarceration, if any. 430 ILCS 65/10(c)(1). *See Evans v. Cook County State's Attorney*, 2021 IL 125513, *P35. This does not mean the request would have been granted, but he would still be able to have his request heard.

Amendment may be permissible." *United States v. Torres*, 789 Fed. Appx. 655, 657-658 (9th Cir. 2020).

"*Heller* referred to felon disarmament bans only as 'presumptively lawful,' which, by implication, means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge." *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010).

"Unless flagged as irrebutable, presumptions are rebuttable." *Binderup v. Attorney Gen. United States of Am.*, 836 F.3d 336, 350 (3rd Cir. 2016) (*en banc*) (Ambro, J.). "A presumption of constitutionality 'is a presumption . . . [about] the existence of factual conditions supporting the legislation. As such it is a *rebuttable* presumption.'" *Id.* at 361 n.6 (Hardiman, J., concurring) (quoting *Borden's Farm Products Co. v. Baldwin*, 293 U.S. 194, 209 (1934)).

> [W]e doubt the Supreme Court couched its first definitive characterization of the nature of the Second Amendment right so as to completely immunize this statute from any constitutional challenge whatsoever. Put simply, we take the Supreme Court at its word that felon dispossession is *presumptively* lawful.

*Id.* (internal quotation marks omitted).

11

However, as this Court knows, Plaintiff has nowhere else to go to seek relief. 18 U.S.C. § 925(c) permits an applicant such as Plaintiff to make an application to the Attorney General to remove Plaintiff's firearm prohibitor and restore his Second Amendment rights if he establishes "that the circumstances regarding the disability, and [his] record and reputation, are such that [he] will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest."

However, since 1992, "Congress has repeatedly barred the Attorney General from using appropriated funds to investigate or act upon [such relief] applications," thus rendering the provision "inoperative." *Logan v. United States*, 552 U.S. 23, 28 n.1 (2007) (quotation marks omitted).

Notably, the statute also provides that "[a]ny person whose application for relief from disabilities is denied by the Attorney General may file a petition with the United States district court for the district in which he resides for a judicial review of such denial. The court may in its discretion admit additional evidence where failure to do so would result in a miscarriage of justice. Plaintiff asserts that the failure to

conduct the hearings in the first place constitutes a constructive denial

allowing for judicial review. In a Federal Arbitration Act case, this

Court noted:

> A showing of unjustifiable delay coupled with irreparable injury if an immediate appeal is not allowed is enough to make a constructive denial appealable, if a formal denial would be. . . . Maybe a showing of delay at once inordinate and unjustified, [ ] . . . is also enough. Otherwise the lower court or agency would have the judicial or administrative equivalent of a pocket veto.

*Cont'l Cas. Co. v. Staffing Concepts, Inc.*, 538 F.3d 577, 580-581 (7th

Cir. 2008). When it comes to constitutional rights, Congress should not

be able to extinguish any hope of restoration through the budget.

Plaintiff should have the ability to be heard somewhere.

Other Courts have agreed with this principle. "[T]he Supreme

Court may be open to claims that some felonies do not indicate potential

violence and cannot be the basis for applying a categorical ban," or,

phrased differently, "the Supreme Court might find some felonies so

tame and technical as to be insufficient to justify [a firearms] ban."

*United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011). The

Eighth Circuit rejected an as-applied challenge to Section 922(g)(1)

where the felon "has not shown that he is 'no more dangerous than a typical law-abiding citizen." *United States v. Woolsey*, 759 F.3d 905, 909 (8th Cir. 2014) (internal quotation marks omitted).

The Ninth Circuit rejected an as-applied challenge from a domestic violence misdemeanant when he "alleged no other facts about himself and his background that would distinguish him from any other domestic violence misdemeanant." *Fortson v. L.A. City Attorney's Office*, 852 F.3d 1190, 1994 (9th Cir. 2017). The *Fortson* Court went on to hold "that a plaintiff must allege facts that distinguish him from the typical person the ban applies to in order to state an as applied claim." *Id.* (citing *Binderup*, 836 F.3d at 346).

Additionally, the D.C. Circuit noted that without administrative relief, such as that referenced in 18 U.S.C. § 925(c):

> the federal firearms ban will remain vulnerable to a properly raised as-applied constitutional challenge brought by an individual who, despite a prior conviction, has become a law-abiding, responsible citizen entitled to use arms in defense of hearth and home.

*Schrader v. Holder*, 704 F.3d 980, 992 (D.C. Cir. 2013) (internal quotation marks and punctuation omitted).

To be sure, some Circuits, including this Court in *Kanter*, have all but held that the presumptive felon firearm ban really means "absolute ban." As described in more detail below, Plaintiff asserts this Court in *Kanter* erroneously strayed from the logical truism noted in *Williams*. Plaintiff asserts that it is not incompatible with both *Kanter* and *Heller* to assert that *some* persons must be so far at the margins that the concerns about dangerousness and public safety that motivated 18 U.S.C. § 922 (g)(1) simply no longer apply.

The district court opinion found that *Kanter* prohibits Plaintiff from receiving an individualized as-applied adjudication of his Second Amendment claim. The district court based its dismissal, at least partly, on that finding.

But *Kanter* itself noted that "[t]here may be a case in the future that requires addressing whether any individual may successfully bring an as-applied challenge to the statute, but Kanter's is not that case." *Kanter*, 919 F.3d at 443. *Hatfield* also noted this possibility, 925 F.3d at 953 ("someone who wants us to carve out particular felonies (or felons) from a category that the Supreme Court has said is presumptively valid must supply an adequate basis for that distinction"). And without

affording Plaintiff any opportunity to address the issue with evidence and/or testimony, the district court committed reversible error.

In *Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011), this Court followed what has become a fairly standard two step approach in Second Amendment cases. That type of analysis can be described as follows: First, the Court determines whether the activity being regulated falls outside the terms of the Second Amendment right to keep and bear arms as it was "publicly understood" at the time of ratification of the Bill of Rights (in the case of a federal law) or at the time of ratification of the Fourteenth Amendment (for a state or local law). *Ezell*, 651 F.3d at 702. If at that stage of the proceedings the government can establish that the challenged law regulates activity falling outside the scope of the Second Amendment right "then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review." *Id.* at 703. Because the Court in *Kanter* found the historical evidence inconclusive as to this point, that Court progressed to step two. *See Kanter*, 919 F.3d at 447.

At step two, in weighing the governmental interest of reducing

firearm violence and whether the categorical ban was substantially related to that goal, the *Kanter* Court looked only to statistics about felons in general, and how Kanter himself had committed a serious felony which left him unable to even make the constitutional challenge. *Id.* at 450.

This Court in *Kanter*, 919 F.3d at 443, listed four previous examples of unsuccessful plaintiffs in as-applied Second Amendment cases: *Baer v. Lynch*, 636 F. App'x 695, 698 (7th Cir. 2016) (individual convicted of felony robbery); *United States v. Shields*, 789 F.3d 733, 750-51 (7th Cir. 2015) (individual who had been convicted of three violent felonies); *Williams*, 616 F.3d at 693-94 (individual convicted of felony robbery who "beat[] the victim so badly that the victim required sixty-five stitches"); and *United States v. Skoien*, 614 F.3d 638, 642, 644 (7th Cir. 2010) (*en banc*) (domestic violence misdemeanant because violence was "an element of the offense" and data suggested high rates of recidivism).

If the above-cited cases are the benchmark (three of the cases were themselves appeals of criminal convictions of unlawful gun possession, thus belying any claim of law-abidingness, while one had

recently finished his sentence for robbery), and everyone is equated to those individuals, then it is no wonder that Plaintiff's claim was rejected out-of-hand. But Plaintiff should have the opportunity to show he is not of that character and overcome the presumption.[2] *See, e.g., Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019). "[I]t may be possible for a felon to show that his crime was so minor or regulatory that he did not forfeit his right to bear arms by committing it ...." *Id.*

Precedent shows how. The Court in *United States v. Vongxay*, 594 F.3d 1111, 1117 (9th Cir. 2010) stated that a felon "may not justly complain of the limitation on his [Second Amendment] liberty when his possession of firearms would otherwise threaten the security of his fellow citizens." (quoting *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004)). However, Plaintiff asserts he is no threat to anyone's security, and never has been. He asserts he can prove it if given the chance.

---

[2] For example, in *Schrader*, the plaintiff was a Navy veteran convicted of common-law misdemeanor assault and battery in Maryland in 1968, served no jail time, and only had a traffic ticket since, but was barred under Section 922(g)(1) because the crime was punishable by more than two years. The D.C. Circuit noted that "[t]o the extent that these allegations are true, we would hesitate to find Schrader outside the class of 'law-abiding, responsible citizens' whose possession of firearms is, under *Heller*, protected by the Second Amendment. *Heller*, 554 U.S. at 635." *Schrader*, 704 F.3d at 991. The Court did not reach the issue, however, holding that the issue was waived for not being argued in the district court. *Id.*

The district court erred in its reading of *Kanter* as excluding Plaintiff from having any rights under the Second Amendment, and that Plaintiff is disallowed from even attempting to prove he belongs in the protected category, and that the presumption against him as noted in *Heller* is overcome by his personal circumstances (SA9).  For that reason *alone,* its ruling granting the Defendants' Motion to Dismiss should be reversed and remanded, so that the District Court can determine whether the Second Amendment applies to an individual like Plaintiff, who unwittingly committed a non-violent federal felony twenty-four years ago, and as to whom every bit of evidence would show he is a law-abiding and productive member of society, who presents no risk of dangerousness to himself, others, or the community at large. Such person should fall within the guarantee of the Second Amendment and be allowed to defend himself with a firearm in his home, as mandated by *Heller*, if only he were allowed to present his case.

By erroneously concluding this case is exactly like *Kanter* and *Hatfield*, and dismissing Plaintiff's Complaint without a record to determine Plaintiff's actual level of dangerousness (given that he already has proven himself beyond the statistical generalities regarding

recidivism offered in *Kanter* and *Hatfield*), the district court committed reversible error.

III. PLAINTIFF'S COMPLAINT SHOULD NOT HAVE BEEN DISMISSED, AS PLAINTIFF SHOULD HAVE BEEN GIVEN THE OPPORTUNITY TO SHOW HE IS OUTSIDE THE CONFINES OF *KANTER*.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

And the Court stressed that "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Id.* at 634 (emphasis deleted).

"Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id.*, 554 U.S. at 634-635. The Second Amendment "is fully applicable against the States." *McDonald*, 561 U.S. at 791.

The Supreme Court in *Heller* stated that felon disarmament laws as "presumptively lawful." *Heller*, 554 U.S. at 626, fn.26 (2008).

Plaintiff does not advance a facial challenge to 18 U.S.C. § 922(g)(1) in this suit. By using the word "presumptively" in referencing the felon disarmament statute, the *Heller* Court sent a clear message there must be *some* way to rebut the presumption. Clearly, the plaintiffs in *Kanter* and *Hatfield* did not qualify, but presumably someone does.

This case, therefore, further tests the limits of whether anyone can ever be considered to be sufficiently rehabilitated and redeemed. Plaintiff committed a crime twenty-four years ago. It was a non-violent felony, one he did not even know he was committing until it was too late, and he paid for it well-in-excess of the $6,000.00 he profited from his unwitting role in the fraud scheme (which he thought was a simple commission for an employee placement).

Weisburd and Chayet noted that even for recidivists with white collar convictions, "In contrast to the high rate offenders, who are more likely than not to have been arrested at one time or another for a violent crime, it was very unlikely for the other event of those with only two rap sheet entries to be a violent crime." David Weisburd and Ellen Chayet, *White Collar Crime and Criminal Careers: A Final Report Submitted to the National Institute of Justice*, 41-42 (1993). This is to

say nothing of someone with only one non-violent white-collar offense, who has demonstrated that he has passed far-beyond the statistical samples offered by the government. The report distinguished between "one-shot offenders," "opportunity seekers," and "high rate offenders." Clearly, Plaintiff has shown he falls into the first category.

And even with that, Plaintiff is not asking the Court to simply rule in his favor, as if taking his word for it simply based on his written Complaint. All Plaintiff is seeking is a hearing, where he can testify in person and give the Court the opportunity to judge his character today, and his lack of dangerousness (*See Kanter*, 919 F.3d at 451 (Barrett, J., dissenting)), and not through the lens of his worst moment long ago.

That such a review should have taken place was demonstrated in *United States v. Barton*, 633 F.3d 168 (3rd Cir. 2011), where the Court held that 18 U.S.C. 922(g)(1) "is also constitutional as applied to Barton because he has presented no facts distinguishing his circumstances from those of other felons who are categorically unprotected by the Second Amendment." *Id.* at 175. Denying rights on the absence of facts, while denying any ability to present such facts, is the height of unreasonableness.

Under *Ezell*, self-defense lies within the core of rights the Second Amendment guarantees; Laws encroaching on that core must satisfy a level of scrutiny approaching strict scrutiny. *See Ezell*, 651 F.3d at 708.

In conducting the *Ezell* two-step analysis, "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id.*, 554 U.S. at 634-635. The analysis must be grounded in the understanding of the Framing Era. "1791, the year the Second Amendment was ratified—[is] the critical year for determining the amendment's historical meaning." *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) (citation omitted).

To rebut the presumption of validity and succeed in an as-applied challenge, "a challenger [must] clear two hurdles: he must (1) identify the traditional justifications for excluding from Second Amendment protections the class of which he appears to be a member, and then (2) present facts about himself and his background that distinguish his circumstances from those of persons in the historically barred class." *Binderup*, 836 F.3d at 346–47 (Ambro, J., opinion) (quoting *Barton*, 633 F.3d at 173-74 (3d Cir. 2011)).

Therefore, using the two-step *Ezell* test, 18 U.S.C. § 922(g)(1) cannot survive constitutional scrutiny as applied to Plaintiff. As in *Ezell*, Plaintiff asserts that he is a law-abiding citizen (yes, he was unwittingly and stupidly involved in something illegal, but that is why Plaintiff seeks the opportunity to prove himself). Banning Plaintiff from forever possessing firearms, even in his home for self-defense, clearly implicates Second Amendment rights (*See Heller*, 554 U.S. at 636). The *Kanter* Court presumed that the restriction implicated the Second Amendment, and moved past step one of the *Ezell* two-step analysis directly to step two – the means-ends analysis. *Kanter*, 919 F.3d at 441, 447 (citing *Ezell,* 651 F.3d at 703.

However, as Judge Hardiman explained for five of the eight judges in the Binderup majority, individualized as-applied challenges also fall into the first category. "It is true that courts typically apply some form of means-end scrutiny to as-applied challenges once it has been determined that the law in question burdens protected conduct." Binderup, 836 F.3d at 363 (Hardiman, J., concurring).

> But when . . . it comes to an as-applied challenge to a presumptively lawful regulation that entirely bars the challenger from exercising the core Second Amendment

> right, any resort to means-end scrutiny is inappropriate once it has been determined that the challenger's circumstances distinguish him from the historical justifications supporting the regulation. This is because such laws are categorically invalid as applied to persons entitled to Second Amendment protection—a matter of scope.

Id.

Despite this, at step two of the *Ezell* test, the *Kanter* Court ultimately concluded that "the felon dispossession statutes are substantially related to the important governmental objective of keeping firearms away those convicted of serious crimes." *Kanter*, 919 F.3d at 451. The fraud committed in *Kanter* ($375.000.00 against Medicare over a period of time) was clearly serious, as was the fraud in *Medina* (a few years after probation for the felony fraud ended, plaintiff was convicted of three counts of misdemeanor fraud). The case law is full of unique individual situations.

Plaintiff regrets his role in the scheme for which he was convicted. However, when one considers the crime, he was convicted not of taking the $6,000.00 – for he was arguably entitled to a commission as a corporate recruiter for placing a client in a position – but for *sharing* the other $6,000.00 with the con man who fraudulently placed the

candidate with his own company and then took half of the commission for doing so. Ironically, if Plaintiff had kept the entire $12,000.00, as an outside recruiter he would have done nothing wrong. This happened one time, and once he realized that something was suspicious about the situation, he refused any further participation. Of course, the authorities were already investigating, and Plaintiff did plead guilty as a voluntary act. But he was not the ringleader, and his unwitting participation was not evidence of a "thought-out crime," at least on Atkinson's part. *See Hatfield*, 925 F.3d at 951.

Atkinson's offense was far less severe than in *Kanter*, and even less than in *Hatfield*, where the plaintiff willfully submitted the fraudulent Railroad Retirement Board benefit claim forms over a period of months to the government. Atkinson accepted responsibility for his actions, and has spent the last twenty years moving past them. He is willing to supply whatever information the Court requires to prove himself, and whatever difficulty the *Kanter* Court found generally in conducting such an investigation (*Kanter*, 919 F.3d at 450-51), Plaintiff would not be such a case.

Plaintiff knows there are plenty of people whose worst moments would make such a request pointless. The *Kanter* Court cited to numerous examples of this. And after all, if the plaintiffs in *Kanter* and *Hatfield* do not meet the standard, especially as compared to the above criminals, then most people would be out of luck. But *someone* has to qualify, and all Plaintiff seeks is a chance to show the Court that it is him. He was all but duped into committing his offense. He would testify in detail how he thought he was engaging in a legitimate business transaction, with no idea he was dealing with someone (A company's HR/Recruitment head – hardly a shady sort) who was engaging in criminal activity. Also, he was not incarcerated for his offense, which distinguishes him from the plaintiff in *Kanter*. And though he received a period of home confinement, his probation was terminated a year early without government objection. "[S]evere punishments are typically reserved for serious crimes. Additionally, punishments are selected by judges who have firsthand knowledge of the facts and circumstances of the cases and who likely have the benefit of pre-sentence reports prepared by trained professionals. With not a single day of jail time, the punishments here reflect the sentencing judges'

assessment of how minor the violations were." *Binderup*, 836 F.3d at 352 (Ambro, J.).

There is much evidence that the statistics relied upon in *Kanter* do not apply to him. Plaintiff refrains from possessing a firearm for self-defense and other lawful purposes because doing so is illegal pursuant to 18 U.S.C. § 922(g)(1), and 430 ILCS 65/14(c)(3). This alone places Atkinson in a different position that the litigants in most of the cases involving 18 U.S.C. § 922(g)(1) such as the defendant in *Vongxay*, 594 F.3d at 1115, who was a felon who was arrested for possessing a firearm while a felon, thus largely removing any argument that he was a law-abiding person. Not coincidentally, this same situation applied to almost all of the examples cited by the *Kanter* Court. Furthermore, as Plaintiff has no history of violence, Defendant's objective is not advanced by prohibiting Plaintiff from possessing arms in his home for self-defense.

Since "the enshrinement of constitutional rights necessarily takes certain policy choices off the table," *Heller*, 554 U.S. at 636, Plaintiff must be given an opportunity to prove that the felon-in-possession law,

as applied to him, is not substantially related to the government's interest.

In *Kanter*, the Seventh Circuit noted the following:

> [T]he government points to several studies that have found a connection between nonviolent offenders like Kanter and a risk of future violent crime. For example, one study of 210,886 nonviolent offenders found that about one in five were rearrested for a violent crime within three years of his or her release. *See U.S. Dep't of Justice, Bureau of Justice Statistics Profile of Nonviolent Offenders Exiting State Prisons* 2, 4 (2004). A separate study found that 28.5 percent of nonviolent property offenders—a category that includes fraud convictions—were rearrested for a violent offense within five years of their release. *See* Matthew R. Durose, *et al., U.S. Dep't of Justice, Bureau of Justice Statistics, Recidivism of Prisoner Released in 30 States in 2005: Patterns from 2005 to 2010*, at 9 (2014).

*Kanter*, 919 F.3d at 449.

Plaintiff has not been [re]arrested for a violent offense – not in three years, or five years, or twenty years.[3] *Kanter* should not bar Plaintiff's claim; *Kanter* shows exactly why Plaintiff is the exception. While *Kanter* has allowed for a "reasonable fit" of the felon-in-possession statute to the purpose of "preventing gun violence by keeping firearms away from persons, such as those convicted of serious crimes,

---

[3] Of course, bring arrested is not the same as being convicted, but that is a discussion for a different plaintiff since Plaintiff was not even rearrested for anything.

who might be expected to misuse them," *Kanter*, 919 F.3d at 448, this begs the question of what should happen when Plaintiff can demonstrate that the evidence relied upon in *Kanter* does not apply to him. "There may be a case in the future that requires addressing whether any individual may successfully bring an as-applied challenge to the statute." *Kanter*, 919 F.3d at 450, fn.12. Plaintiff respectfully submits that this is that case, and that alone warranted the denial of Defendants' Motion to Dismiss, and warrants reversal here.

Plaintiff further asserts that while crime prevention is of course an important goal, the issue could very well be life-or -death for him. At least 19 professionally conducted national surveys have specifically asked respondents whether they had used a gun for self-protection. The most technically sound of the surveys indicated there were 2.5 million defensive gun uses in 1992 (Kleck, Gary and Gertz, Marc, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, J. of Criminal Law and Criminology, v.86, n.1, pp.150-187 (1995)).

That survey indicated that 36% of the defensive uses were carried out near but not in the defender's home and another 27% were carried out in locations that were neither near nor in the defender's home (*Id.*

at 185). This leaves 37% of the defensive gun uses to have occurred in the defender's home. Thus, anywhere from 296,000 to 1,332,000 defensive uses in 1992 occurred in the defender's home, and anywhere from 288,000 to 1,296,000 defensive uses in 1992 occurred near the defender's home.

Since crime rates are only about half as high today as in 1992, the number of defensive gun uses is probably likewise about half what it was back then - perhaps about 1.25 million. Nevertheless, the number of defensive uses is still enormous. As a point of reference, in 2014 about 466,110 crimes were committed with firearms, including both crimes reported to the police and crimes not reported (*See* Jennifer L. Truman, Ph.D., and Lynn Langton, Ph.D,. *Criminal Victimization, 2014*. U.S. Bureau of Justice Statistics. August, 2015, Revised September 29, 2015. Available online at http://www.bis.gov/content/pub/pdf/cv14.pdf, p.3). Defensive uses of guns by crime victims therefore appears to be about three times more common than crimes committed by offenders using guns.

Further, when people defend themselves with firearms, they are less likely to be injured or lose property than crime victims in otherwise

similar circumstances who use other defensive strategies or who do not resist. Any position to the contrary is inconsistent with the best available research evidence.

Defensive gun use (DGU) is effective as well as frequent. The best available evidence on the effect of DGU on whether the victim is injured or loses property was generated in a series of analyses of data generated by the U.S. Census Bureau's National Crime Victimization Survey, which provides detailed information on self-protective actions about the largest available, nationally representative sample of crime victimization incidents that Gary Kleck conducted with a series of colleagues (Kleck, Gary. *Crime Control Through the Private Use of Armed Force*, Social Problems 35(l):1-21 (1988); Kleck, Gary, and Susan Sayles, *Rape and Resistance*, Social Problems 37(2):149-162 (1990); Kleck, Gary, and Miriam DeLone, *Victim Resistance and Offender Weapon Effects In Robbery*, Journal of Quantitative Criminology 9(1):55-82 (1993); Tark, Jongyeon, and Gary Kleck. *Resisting Crime: The Effects of Victim Action on the Outcomes of Crimes.* Criminology, 42(4):861-909 (2004).

These studies uniformly indicate that crime victims who use guns in self-protection are less likely to be injured or lose property than otherwise similar crime victims who either used other self-defense strategies or did not resist at all. On the rare occasions that gun-using victims were injured, the injuries were inflicted on the victims before the victims used their guns defensively. Further, victims who defended themselves with guns tended to do so in more desperate circumstances, *i.e.* circumstances more threatening to the victim, than those who adopted other self-protection strategies. Gun users were more likely to be outnumbered, to be facing offenders with weapons, and to have already been injured before wielding the gun in self-defense. It is therefore all the more impressive that gun defenders managed to come out of the crimes with so little harm. As one measure of success in avoiding harm, the Tark and Kleck (2004) analysis found that only 2.4% of crime victims who used guns suffered any kind of injury after the defensive gun use, and less than 1% suffered any injury more serious than cuts and bruises (p. 878).

When considering the fact that a Salt Lake City police sergeant determined that an attacker could cover 21 feet (the size of a typical

large room in a home, such as a living room) and stab a victim in 1.5 seconds (*See* Tueller, Dennis*, "How Close is Too Close," S.W.A.T. Magazine*, (March 1983) (*see*

http://www.theppsc.org/Staff_Views/Tueller/How.Close.htm (last viewed May 16, 2021))*, the Defendants' restrictions on the ability to engage in armed self-defense are even more egregious.

Thus, there is substantial public benefit in allowing law-abiding citizens to possess firearms for self-defense purposes, a benefit is severely hampered when deserving persons are categorically prohibited from possessing a firearm without even a chance to prove their worthiness. "Felons are more than the wrongs they have done. They are people and citizens who are part of 'We the People of the United States.' U.S. Const. pmbl. So they too share in the Second Amendment 'right of the people to keep and bear Arms,' subject only to the historical limits on that right." *Folajtar v. AG of the United States*, 980 F.3d 897, 912-913 (3rd Cir. 2020) (Bibas, J., dissenting).

As applied to Plaintiff, 18 U.S.C. § 922(g)(1) is not sufficiently tailored to achieve its claimed benefit. At the very least, Plaintiff stated a valid claim that the Defendants violated his Second Amendment

rights. The Defendants did not show that there is no set of facts consistent with Plaintiff's Complaint upon which relief could be granted, not while *Kanter*, *Hatfield*, and other such cases recognize at least the *possibility* that an as-applied plaintiff can show the unconstitutionality of 18 U.S.C. § 922(g)(1). "There may be a case in the future that requires addressing whether any individual may successfully bring an as-applied challenge to the statute, but Kanter's is not that case." *Kanter*, 919 F.3d at 443. This is that case.

It must be noted that Plaintiff is not challenging the constitutionality of 18 U.S.C. § 922(g)(1) facially or generally, or as to all persons with non-violent felony convictions, or even as to all persons with long-ago non-violent convictions who have remained law-abiding and productive ever since their conviction. "[A]n as-applied challenge 'does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right.' *Binderup*, 836 F.3d 336, 345-346 (quoting *United States v. Marcavage*, 609 F.3d 264, 273 (3rd Cir. 2010)); *see also Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) ("It is axiomatic that a statute may be invalid

as applied to one state of facts and yet valid as applied to another"); *see also Schrader*, 704 F.3d at 989-90, 991 (differentiating between analysis of 18 U.S.C. § 922(g)(1) "as applied" to all common-law misdemeanants, which the Court discussed, and individual as-applied analysis, declining to conduct the latter because issue was deemed waived).

Plaintiff is only challenging the constitutionality of 18 U.S.C. § 922(g)(1) as applied to him. One person. One person who has already demonstrated that he has transcended the statistics and beaten whatever odds to which the Defendants' data suggests Plaintiff's future is tied. *One person*, who the Defendant believes is so bent on felonious recidivism, and with a firearm this time, apparently, that he would go to the extraordinary lengths of filing a federal lawsuit and appeal just for the purpose of having his rights restored so that he would be able to obtain that firearm, so that he can then – finally – go out and commit that violent gun crime.

It is not just bad policy to presume that a person is no better than their worst moment – no matter how non-violent or how long ago, even if that presumption surely applies to some people. Clearly, in using a number of violent criminals as examples in *Kanter*, the Court made the

presumption that all felons are perpetual dangers. The district court expressed this attitude when it rejected Plaintiff's allegation that he merely wants to be able to exercise the Second Amendment right to self-defense ("Atkinson also suggests that he is exceptional because he only wants a gun for self-defense. But what convicted felon would say otherwise?"). SA10, fn.1.

But without affording the individual to show any evidence of change and growth, the presumption is dehumanizing and unreasonable.

Defendants' Motion to Dismiss should have been denied, and the lower court must be reversed.

## IV. *KANTER* WAS WRONGLY DECIDED AND LED THE DISTRICT COURT TO AN INCORRECT CONCLUSION.

Finally, for the following reasons, Plaintiff requests this Court revisit and replace the *Kanter* standard for determining whether, as-applied to Plaintiff, the Ordinance violates the Second Amendment.

The Supreme Court stated in *Heller* and *McDonald* that the Second Amendment "guarantee[s] the individual right to possess and

carry weapons in case of confrontation." *Heller*, 554 U.S. at 592;

*McDonald*, 561 U.S. at 3104.

This comports with *Heller*'s holding that the Second Amendment

"*elevates above all other interests* the right of law-abiding, responsible

citizens to use *arms* in defense of hearth and home." *Heller*, 554 U.S. at

635 (emphasis added).

## A.    Dangerousness Is Meant To Be the Touchstone of Individual Firearm Bans.

There is guidance for who falls into the category of "responsible"

and "law-abiding." "[T]he right to carry is a right held by responsible,

law-abiding citizens for self-defense . . . 'responsible' must include those

who are no more dangerous with a gun than law-abiding citizens

generally are." *Wrenn v. District of Columbia*, 864 F.3d 650, 664 (D.C.

Cir. 2017) (citation omitted). "At a minimum, then, the Second

Amendment must enable armed self-defense by commonly situated

citizens: those who possess common levels of need and pose only

common levels of risk." *Id.* "[T]he point of the Amendment [is] that guns

would be available to each responsible citizen as a rule (*i.e.*, at least to

those no more prone to misuse that access than anyone else).” *Id.* at 665-66.

“History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns.” *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting). “[T]hat power extends only to people who are dangerous. Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons.” *Id.*

We know this because “‘[t]he best historical support for a legislative power to permanently dispossess all felons would be founding-era laws explicitly imposing—or explicitly authorizing the legislature to impose—such a ban,’ but scholars and judges thus far ‘have not been able to identify any such laws.’” *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting). *See also* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 275–83 (2020) (tracing the virtuous-citizen theory to its roots in scholarship from the 1980’s and finding no historical law disarming anyone based on virtue).

Then-Judge Barrett noted the English common-law, including how ""English common law 'punish[ed] people who [went] armed to terrify the King's subjects' with imprisonment and forfeiture of their 'armour,'" *id.* at 456 (quoting *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686)). Parliament also disarmed Catholics for fear of threats or terror. *See Kanter*, 919 F.3d at 457 (Barrett, J., dissenting); *see also* C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 723 (2009).

In the American colonies, the policies of disarmament were focused on those whose loyalty were questioned, as the colonies were concerned about "social upheavals" and "rebellion." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 157 (2007)). "After all, confiscation of guns from those who refused to swear an oath of allegiance was meant to deal with the potential threat coming from armed citizens who remained loyal to another sovereign." *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting) (quotation marks omitted). Massachusetts, Pennsylvania, and Connecticut, for example, disarmed loyalists to the Crown and those

who refused to swear allegiance to the state or United States – not because they were unvirtuous, but because they were potentially dangerous. *See*, *e.g.*, *Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting); *see also* G.A. Gilbert, *The Connecticut Loyalists*, 4 AM. HIST. REV. 273, 281–82 (1899)).

Finally, looking to the adoption of the Constitution itself, the closest proposals to a complete felon disarmament ban that existed were from the New Hampshire, Pennsylvania, and Massachusetts ratifying conventions. But those were all focused on dangerousness, as "[t]he concern common to all three is not about felons in particular or even criminals in general; it is about threatened violence and the risk of public injury." *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting).

New Hampshire recommended that "Congress shall never disarm any citizen, *unless such as are or have been in actual rebellion*." 1 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 326 (2d ed. 1891) (emphasis added). Massachusetts had a proposal that the Constitution "be never construed to authorize Congress to . . . prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 2

Bernard Schwartz, *The Bill of Rights: A Documentary History*, 675, 681 (1971) (emphasis added).

This, of course, raises the question of what the term "peaceable" meant to the Framers, but the term then was associated with dangerousness as well. *See* 1 Samuel Johnson, *A Dictionary of the English Language* (5th ed. 1773) (defining "peaceable" as "[f]ree from war; free from tumult"; "[q]uiet; undisturbed"; "[n]ot violent; not bloody"; "[n]ot quarrelsome; not turbulent"). And to the extent that "peaceability" was connected to criminal conduct, a "breach of the peace" was connected directly to danger and violence. *See, e.g., Atwater v. City of Lago Vista*, 532 U.S. 318, 327 & n.2 (2001) (noting some "variations in the common-law usage of the term 'breach of the peace'" but assuming the definition "entail[ed] at least a threat of violence"); Michael Dalton, *The Country Justice* 9 (1727) ("The Breach of th[e] Peace seemeth to be any injurious Force or Violence moved against the Person of another, his Goods, Lands, or other Possessions, whether by threatening words, or by furious Gesture, or Force of the Body, or any other Force used *in terrorem*.").

As for the remaining proposal, that of the Pennsylvania Minority, they suggested adding language to the Constitution specifying that "no law shall be passed for disarming the people or any of them *unless for crimes committed, or real danger of public injury from individuals . . . .*" 2 Schwartz, *supra*, at 662, 665 (emphasis added). While one could read this proposal broadly to capture "those who have committed any crime—felony or misdemeanor, violent or nonviolent," as well as "those who have not committed a crime but nonetheless pose a danger to public safety," such a reading is implausible given that no one—either at the Founding or today—reads the language of "crimes committed" in the proposal "to support the disarmament of literally all criminals, even nonviolent misdemeanants." *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting). Further, the Pennsylvania Minority did not even convince Pennsylvania, much less the rest of the states. Even if construed extraordinarily broadly, it cannot be construed as probative of the actual meaning of the Second Amendment.

Therefore, the "virtuous citizen" standard for disarmament, on which the *Kanter* majority relied, respectfully does not have a historical foundation. After reviewing the "eight academic articles and decisions of

six other circuits," that the plurality in *Binderup* relied upon to support its virtue-based theory of the Second Amendment, Judge Bibas in dissent in *Folajtar* found that "all these articles and cases show that the virtue theory is flimsy" because "[m]ost of the evidence dovetails with dangerousness." *Folajtar*, 980 F.3d at 919 (Bibas, J., dissenting). Further:

> Most felonies today are far removed from those capital crimes at common law. We often see little rhyme or reason in which crimes are labeled felonies. For instance, a radio talk show host can become a felon for uttering "any obscene, indecent, or profane language by means of radio communication." 18 U.S.C. § 1464. In New Jersey, opening a bottle of ketchup at the supermarket and putting it back on the shelf is a third-degree felony, punishable by up to five years' imprisonment. *See* Paul H. Robinson *et al.*, *Report on Offense Grading in New Jersey* 3 (2011) (citing N.J. Stat. Ann. §§ 2C:40-17(a), 2C:43-6.a(3) (West 2010)). And in Pennsylvania, reading another person's email without permission is a third-degree felony, punishable by up to seven years. Paul H. Robinson *et al.*, *The Modern Irrationalities of American Criminal Codes: An Empirical Study of Offense Grading*, 100 J. Crim. L. & Criminology 709, 719 & nn.44, 46 (2010) (citing 18 Pa. Const. Stat. Ann. § 7613 (West Supp. 2010)).

> All this goes to show that today, a felony is whatever the legislature says it is. The category is elastic, unbounded, and manipulable by legislatures and prosecutors. Prosecutors often persuade legislatures to add more crimes to that category to give themselves

> more plea-bargaining options and leverage. *See* William J. Stuntz, *The Pathological Politics of Criminal Law*, 100 Mich. L. Rev. 505, 523-33, 536-37 (2001).

*Folajtar*, 980 F.3d at 921 (Bibas, J., dissenting).

Section 922(g)(1) is not triggered by a finding of dangerousness. Unlike some state disarmament provisions, e.g., 18 Pa. Const. Stat. Ann. § 6105(b); N.J. Stat. Ann. § 2C:39-7, it is not even triggered by a conviction for an enumerated crime or type of crime. Rather, Section 922(g)(1) applies on the basis of an offense's potential sentencing range.

But "[a] crime's maximum possible punishment is 'purely a matter of legislative prerogative,'" *Binderup*, 836 F.3d at 351 (quoting *Rummel v. Estelle*, 445 U.S. 263, 274 (1980)), "subject only to 'constitutional prohibitions on irrational laws,'" *id.* (quoting *Heller*, 554 U.S. at 628, n.27) (other citation omitted). If this sort of legislative determination sufficed to place people outside the Second Amendment's scope, wholesale permanent denial of the right to arms would effectively be subject to rational-basis review. *Id.* And while "felony" may have a commonly-understood meaning, legislatures are free to define the term and classify crimes as they wish. Notably, Section 922(g)(1)'s

45

colloquially-understood "felon in possession" ban applies to many misdemeanants, such as in *Schrader* and *Binderup*.

To be sure, by and large the legislature's choices as to what acts to criminalize, or what sentences to impose are its prerogative. But that unyielding deference must give way when constitutional rights are at stake. *See id.* "Otherwise, 'the Government could make an end-run around the Second Amendment and undermine the right to keep and bear arms." *Id.* at 921-22 (quoting *Binderup*, 836 F.3d at 350-51 (Ambro, J.)).

One critique authored by a long-time federal district judge noted that district courts routinely sentence white-collar defendants to the absolute minimums, likely because of "the near universal lack of faith in the Sentencing Commission's approach to economic crime sentencing" and "likely because, as with a wide range of critics, federal judges lack sufficient confidence in the policies underlying it and the sentencing ranges it produces." Mark W. Bennett, Justin D. Levinson, & Koichi Hioki, *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 Iowa L. Rev. 939, 989 (2017). Plaintiff notes, as the Courts have, that the

potential sentence's upper limit is what prompts 18 U.S.C. § 922(g)(1),

but if the federal district courts[4] feel the potential sentences are overall

too high, perhaps the mere fact an offense has a high-end sentencing

limit overstates the seriousness of the offense. Perhaps, then, the actual

sentence should be given more weight.

This is why, in defining a fundamental right's scope, courts cannot

blindly defer to legislative classifications. Both *Binderup* majority

authors used the phrase "puts the rabbit in the hat" to dismiss the

notion that sentencing classifications, without more, remove individuals

from the right's scope. *Binderup*, 836 F.3d at 350 (Ambro, J.); *id.* at 365

n.11 (Hardiman, J., concurring).

> Why not minor infractions? Could Congress find
> someone once cited for disorderly conduct to be "not
> law-abiding" and therefore to have forfeited his core
> Second Amendment right? . . . . Why should we not
> accept every congressional determination for who is or
> is not "law-abiding" and "responsible" for Second
> Amendment purposes?

*United States v. Chovan*, 735 F.3d 1127, 1148 (9th Cir. 2013) (Bea, J.,

---

[4] "Adding volume to the already existing chorus of dissent are the results of our original empirical study of 100 federal district court judges, and 240 judges overall, which showed remarkable minimum sentencing agreement among an extremely diverse group of judges. The study also showed that the desire for these minimum sentences largely overpowered judges' differences in sentencing philosophies such as retribution." Bennett, *Federal White-Collar Fraud Sentencing* at 989.

concurring).

"Why not? Because *Heller* was a constitutional decision. It recognized the scope of a passage of the Constitution. The boundaries of this right are defined by the Constitution. They are not defined by Congress." *Id.* "When the Second Amendment applies, its core guarantee cannot be withdrawn by the legislature or balanced away by the courts." *Binderup*, 836 F.3d at 365 (Hardiman, J., concurring) (footnote omitted).

The *Binderup* three-judge opinion also recognized that Courts must not 'defer blindly' to maximum possible punishments," *Binderup*, 856 F.3d at 350-51 (Ambro, J.), and that it is "important" to look at the sentence imposed on a specific defendant. *Id.* at 352 (Ambro, J.). That is a truer sign of whether a particular crime is "serious" or 'minor.' *Id. See also Folajtar*, 980 F.3d at 922 (Bibas, J., dissenting).

Then-Judge Barrett also explained in *Kanter* why the concept of "civil death," where the states permanently extinguished the rights of felons, either by death or operation of law, in the eighteenth and nineteenth centuries, did not apply to the Second Amendment analysis, as "for felons sentenced to less than life, the courts understood their

rights as 'merely suspended during the term of the sentence.'" *Kanter*, 919 F.3d at 461 (Barrett, J., dissenting)).

Additionally, there is evidence that "unvirtuous citizens" were sometimes expressly allowed to maintain their arms. For example, in 1786 Massachusetts, if the tax collector stole the money he collected, the sheriff could sell the collector's estate in order to recover those monies. If the sheriff then stole the money from the collector's estate sale, the sheriff's estate could be sold to recover the amount he stole. And if an estate sale did not cover the stolen amount, the deficient collector or sheriff would be imprisoned. However, in said estate sales, certain items deemed necessary, *including firearms*, could not be sold:

> [I]n no case whatever, any distress shall be made or taken from any person, of his *arms* or household utensils, necessary for upholding life; nor of tools or implements necessary for his trade or occupation, beasts of the plough necessary for the cultivation of his improved land; nor of bedding or apparel necessary for him and his family; any law, usage, or custom to the contrary notwithstanding.

1786 Mass. Laws 265 (emphasis added).

Further, the "virtuous citizen" standard envisioned the Second Amendment as a "civic right" like voting and jury service, rather than

an individual right, and therefore "belonged only to virtuous citizens." *Kanter*, 919 F.3d at 462–63 (Barrett, J., dissenting). But *Heller* expressly rejected the notion that the Second Amendment right was a civic right, holding instead that "the Second Amendment confer[s] *an individual right* to keep and bear arms," *Heller*, 554 U.S. at 595 (emphasis added); *see also Kanter*, 919 F.3d at 464 (Barrett, J., dissenting):

> The Second Amendment confers an individual right, intimately connected with the natural right of self-defense, and not limited to civic participation (*i.e.*, militia service)."). And because no one has ever presented evidence that virtue-based exclusions have been applied to individual rights—like the freedoms of speech or religion - "they don't apply to the Second Amendment."

*Kanter*, 919 F.3d at 463 (Barrett, J., dissenting).

Plaintiff requests, therefore, this Court overrule *Kanter* to the extent it adopted the "virtuous citizen" standard, which allows Plaintiff no opportunity, ever - not even when he is 90 years old - to show that he is a non-dangerous person who is more than his 1998 felony conviction. Plaintiff requests that instead this matter be remanded to the district court where Plaintiff can make his case that he is a non-dangerous

person who lies outside the presumptively-valid parameters of 18

U.S.C. § 922 (g)(1).

Section 922(g)(1) was enacted to "keep firearms out of the hands of presumptively 'risky people.'" *United States v. Bass*, 404 U.S. 336, 345 (1971). "The broad objective of § 922(g)—suppressing armed violence— is without doubt an important one." *United States v. Yancey*, 621 F.3d 681, 684 (7th Cir. 2010) (citations omitted). The Framers did not have felon disarmament laws, but they were nonetheless familiar with disarming "risky people" to "suppress armed violence."

> [A]ctual "longstanding" precedent in America and pre-Founding England suggests that a firearms disability can be consistent with the Second Amendment to the extent that . . . its basis credibly indicates a present danger that one will misuse arms against others and the disability redresses that danger.

Marshall, *Why Can't Martha Stewart* at 698.

"[O]ne can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I." *Id.* at 708.

It was only in 1938 that Congress, for the first time, restricted anyone's access to firearms: prohibiting persons convicted of a "crime of

violence" from shipping or receiving firearms in interstate commerce. Federal Firearms Act, Pub. L. No. 75-785, § 2(e), (f), 52 Stat. 1250, 1251 (1938) ("FFA"). The FFA defined "crime of violence" to include only "murder, manslaughter, rape, mayhem, kidnaping, burglary, housebreaking; assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year." FFA § 1(6), 52 Stat. at 1250. *See also United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011), *cert. den.*, 132 S. Ct. 1538 (2012).

In enacting the FFA, "Congress sought . . . to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." *Scarborough v. United States*, 431 U.S. 563, 572 (1977) (internal citations and quotation marks omitted).

In 1961, Congress enlarged this prohibition to include nonviolent criminals by replacing the "crime of violence" element with "crime punishable by imprisonment for a term exceeding one year." An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757, 757 (1961). In 1968, Congress again expanded the prohibition by

replacing the "receipt" element of the 1938 law to "possession," giving

18 U.S.C. § 922(g)(1) its current form. Omnibus Crime Control and Safe

Streets Act of 1968, Pub. L. No. 90-351, tit. VII, § 1202, 82 Stat. 197,

236. Despite this expansion, the Courts have recognized that the point

of 18 U.S.C. § 922(g)(1) was to keep firearms out of the hands of risky,

threatening, and dangerous people. *See, e.g., Scarborough supra.*

Plaintiff as an individual simply does not fall into that category.

## B. The "Virtuous Citizen" Test Is Not A Part of the Second Amendment.

The *Kanter* majority held that a felon is categorically banned not

on the basis of whether he or she is actually dangerous to anyone, but

because the fact of the conviction, regardless of how <u>long</u> ago or whether

it involved violence, means the person does not qualify as a "virtuous

citizen." While the majority held this to be the test, it was not correct.

An alternative view, advanced by three of the eight judges in the

*Binderup* majority, held that the traditional standard for disarmament

is not dangerousness *per se* but lack of virtue. *Binderup*, 836 F.3d at

348-49 (Ambro, J.). Under this approach, the two concepts are not

synonymous. Violent criminals "undoubtedly qualify as 'unvirtuous

citizens,'" but "[t]he category of 'unvirtuous citizens' is . . . broader than violent criminals; it covers any person who has committed a serious criminal offense, violent or non-violent." *Id.* at 348. A multifactor balancing test was then offered to delineate serious from non-serious crimes. *Id.* at 351-52. "[T]here are no fixed criteria for determining whether crimes are serious enough to destroy Second Amendment rights," and "the category of serious crimes changes over time as legislative judgments regarding virtue evolve." *Id.* at 351.

This approach is rooted in the assertion, made by this Court among others, that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *Yancey*, 621 F.3d at 684-85. Yet in *Yancey*, this Court treated lack of virtue as synonymous with dangerousness, following its virtuousness observation with "[a]s we've explained . . . most felons are nonviolent, but someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use." *Id.* at 685 (citation omitted).

The notion that a lack of "virtuousness" apart from

54

"dangerousness" can be grounds for disarmament is historically incorrect. At the heart of the alleged scholarly support for Defendant's "virtuousness" argument lie three law review articles: Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461 (1995); Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143 (Winter 1986); and Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657 (2002). But these articles do not sustain the "virtuousness" theory.

Reynolds's treatment of the issue in his Critical Guide footnotes two sources for his claims on virtuousness and disarmament: the Kates *Dialogue* article at the same page cited by Defendant, and Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 215-16 (1983). *See* 62 Tenn. L. Rev. at 480 n.86 & n.87.

Kates's Dialogue contains the familiar language borrowed by Reynolds, for which it provides a citation to Kates's *Handgun Prohibition* article, at 266 as "(citing formulations in which the Founders explicitly limited the right to law-abiding citizens)." 49 Law &

Contemp. Probs. at 146 n.19. This description does not mention "virtuousness," and in the *Handgun Prohibition* article, at 266, one finds a claim only that felons were outside the common law because they typically faced dispossession and death. Kates notes that "[w]e may presume that persons confined in gaols awaiting trial on criminal charges were also debarred from the possession of arms," and that "[a]ll the ratifying convention proposals which most explicitly detailed the recommended right-to-arms amendment excluded criminals and the violent." 82 Mich. L. Rev. at 266.

To support his proposition, Kates refers the reader to "notes 70, 72 & 83 supra and accompanying text." *Id.* at 266 n.267. These notes merely cite the right to arms proposals made in the New Hampshire, Pennsylvania, and Massachusetts conventions, which excluded nonpeaceable and dangerous citizens from the right. Turning to pages 215-16 of the same article, cited earlier by Reynolds, one finds only a discussion of the militia system.

That leaves the Court with the Cornell's "*Don't Know Much About History*" article. Cornell, possibly the leading proponent of the "collective rights" theory twice rejected by the Supreme Court, states

that the "right [to arms] was not something that all persons could claim, but was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." 29 N. Ky. L. Rev. at 679 & n.201. The given footnote leads to another footnote, directing the reader to a "discussion" on the next page that does not discuss the "virtuousness" theory.

In any event, whether "most" scholars believe the Framers were motivated to disarm people by considerations of "virtue" is beside the point. There is zero evidence that the Framers did so. *See Binderup*, 836 F.3d at 371-72 (Hardiman, J., concurring). The *Kanter* Court cited to Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868) as evidence, but Cooley had almost nothing to say about the Second Amendment at all: "How far it is in the power of the legislature to regulate this right, we shall not undertake to say, as happily there has been very little 'occasion to discuss that subject by the courts." *Id.* at 350. The only reference possibly approaching disarmament was Cooley's footnote citations to *Bliss v. Commonwealth*, 2 Lit. 90 (1822, Ky.), where prohibiting the bearing of concealed arms

for self-defense was declared unconstitutional, and *Nunn v. State*, (1 Ga.) 1 Kel. 243 (1846) (state handgun ban declared unconstitutional).

Modern theories of "virtuousness" are no substitute for the copious evidence that dangerousness has always been the touchstone for disarmament, as discussed by then-Judge Barrett in her dissent in *Kanter*. Because felons, as a class, are viewed as posing a greater potential danger to society, their near-categorical disarmament is taken to be presumptively lawful. *Yancey*, 621 F.3d at 685. Of course, Section 922(g)(1) does not extend to all felons, excluding the unvirtuous people convicted of "any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices." 18 U.S.C. § 921(a)(20)(A). One must ask why the virtue of those felons remains unscathed, while other non-violent felons, such as Plaintiff, get a lifetime ban.

Besides its lack of historical pedigree, "virtuousness" is not a useful judicial standard for determining who retains a fundamental right. Any criminal activity suggests a lack of virtue. Strong arguments can be made that many low-level crimes, or even non-criminal rudeness

or selfishness, reflect a lack of virtue or even hostility to basic social norms and may undermine a person's status as a "virtuous citizen." However, such lack of virtue does not, and should not, deprive one of the fundamental right of self-defense.

Therefore, based on how the decision in *Kanter* incorrectly analyzed whether the Second Amendment permits a categorical ban against all felons with no opportunity to even attempt an as-applied challenge to said ban, and how the district court in this case followed that same incorrect standard, and considering how Plaintiff was never given the opportunity to make his case using the correct analyses, this case should not be decided solely on the pleadings.

This is reversible error for as this Court has observed:

> The "language of an opinion is not always to be parsed as though we were dealing with language of a statute," *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979), for "[j]udges expect their pronunciamentos to be read in context." *Wisehart v. Davis*, 408 F.3d 321, 326 (7th Cir. 2005); *see also Illinois v. Lidster*, 540 U.S. 419, 424 (2004) (general language in judicial opinions must be read in context and not as "referring to quite different circumstances that the Court was not then considering"); *Cohens v. Virginia*, 19 U.S. 264, 399 (1821) (Marshall, C.J.) ("general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the

case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.").

*United States v. Yang*, 799 F.3d 750, 755 (7th Cir. 2015).

The district court should rather be ordered to decide the important questions raised in this case—*e.g.*, whether 18 U.S.C. § 922(g)(1) unconstitutionally infringes Plaintiff's rights to keep and bear arms on an individual, as-applied basis, and on a fully developed factual record relevant to Plaintiff himself, rather than statistical generalities which Plaintiff has already shown do not apply to him.

## CONCLUSION

In light of the above, the District Court's F.R. Civ. P. 12(b)(6) dismissal of Plaintiff's Complaint should be reversed and remanded with instructions that Defendants file an Answer to Plaintiff's Complaint and that Plaintiff's Second Amendment claim should proceed to the discovery process, as well as any and all relief consistent with such ruling.

Dated: May 18, 2022                Respectfully submitted,

                                   By: _____ /s/ David G. Sigale _____
                                            David G. Sigale

                                   Attorney for Plaintiff-Appellant
                                   Patrick Atkinson


David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
430 West Roosevelt Road
Wheaton, IL 60187
630.452.4547/630.596.4445 Fax
dsigale@sigalelaw.com

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,991 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(b), and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using Microsoft Word 2016 in 14 point Century font.

                                    /s/ David G. Sigale
                                    David G. Sigale

                                    Attorney for Plaintiff-Appellant

Dated: May 18, 2022

☑

# CERTIFICATE OF SERVICE

**Certificate of Service When All Case Participants Are CM/ECF Participants**

I hereby certify that on ___May 18, 2022___, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ ___David G. Sigale___

☐

# CERTIFICATE OF SERVICE

**Certificate of Service When Not All Case Participants Are CM/ECF Participants**

I hereby certify that on _____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

counsel / party:                                    address:

_____                    _____

_____                    _____

_____                    _____

_____                    _____

_____                    _____

_____                    _____

_____                    _____

_____                    _____

s/ _____

REQUIRED SHORT APPENDIX

TABLE OF CONTENTS

CIRCUIT RULE 30(d) STATEMENT ……………………………………. i

DISTRICT COURT JUDGMENT …………………………………. SA 1

DISTRICT COURT OPINION …………………………………... SA 2

COMPLAINT …………………………………………………. SA 12

NOTICE OF APPEAL (DATED 4/5/22) ……………………...… SA 23

CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) are included in the required short appendix. All materials required by Circuit Rule 30(b) are also included in the short appendix pursuant to Circuit Rule 30(b)(7).

　　　　　　　　　　/s/ David G. Sigale
　　　　　　　　　　David G. Sigale

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Patrick Atkinson,

Plaintiff(s),

v.

Regina Lombardo,

Defendant(s).

Case No. 21 CV 291
Judge John Robert Blakey

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐     in favor of plaintiff(s)
and against defendant(s)
in the amount of $       ,

       which ☐ includes     pre–judgment interest.
               ☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

___

☐     in favor of defendant(s)
and against plaintiff(s)

.

Defendant(s) shall recover costs from plaintiff(s).

___

☒     other: This case is dismissed with prejudice.

___

This action was *(check one)*:

☐ tried by a jury with Judge     presiding, and the jury has rendered a verdict.
☐ tried by Judge     without a jury and the above decision was reached.
☒ decided by Judge John Robert Blakey.


Date:   3/15/2022            Thomas G. Bruton, Clerk of Court

                            <u>G. Lewis</u> , Deputy Clerk

SA1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PATRICK ATKINSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21 C 291 |
| | ) | |
| v. | ) | Judge John Robert Blakey |
| | ) | |
| MERRICK GARLAND, in his official | ) | |
| capacity as Attorney General of the | ) | |
| United States, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Federal law precludes Patrick Atkinson, a convicted felon, from possessing a firearm. *See* 18 U.S.C. § 922(g)(1). Atkinson has sued the Attorney General of the United States and the Acting Director of the Bureau of Alcohol, Tobacco, Firearms, challenging the constitutionality of this law. *See* [1]. Defendants move to dismiss, [6], and because Atkinson's claim plainly lacks merit, the Court grants the motion.

## I. The Complaint's Allegations

On October 16, 1998, Atkinson pled guilty to one count of mail fraud in violation of 18 U.S.C. § 1341, a Class C felony. [1] at ¶ 7. At that time, Atkinson worked as an Executive Recruiter for Waterford Executive Group, a company he founded in 1990. *Id.* at ¶ 8. One of his clients, John Zerba, worked in the recruiting department at a large Illinois company that specialized in consultants and outsourcing; Atkinson placed actuaries and consultants at the company in exchange for a consulting fee. *Id.* In 1998, Zerba offered Atkinson a moonlighting job whereby

SA2

Zerba would find professional candidates, Atkinson would place them with employers, and the two would split the recruiting fee. *Id.* at ¶ 9. The arrangement worked without incident a couple of times. *Id.*

A few months later, Zerba sent Atkinson a resume for a candidate from Virginia. *Id.* at ¶ 10. When Atkinson could not place the candidate, Zerba hired him at his company. *Id.* Zerba nonetheless demanded that Atkinson send him half the recruiting fee, and Atkinson did so. *Id.* Shortly thereafter, Zerba sent Atkinson another candidate for placement at Zerba's own company; Atkinson thought this seemed suspicious and declined. *Id.* at ¶ 11. Zerba's company later sued Atkinson for fraud, civil RICO violations, and conspiracy; Atkinson settled that case for $45,000. *Id.* at ¶ 13.

Upon further investigation, authorities learned that Atkinson had participated in a fraudulent "hub and spoke" scheme that Zerba was running with other recruiters. *Id.* at ¶ 12. For his involvement, Atkinson was charged with one count of mail fraud in violation of 18 U.S.C. § 1341, a Class C felony punishable by a sentence of up to twenty years. 18 U.S.C. § 1341 (2019); *Id.* at ¶¶ 7, 14. Atkinson was sentenced to two years of probation, which was terminated after one year. *Id.* at ¶ 14. He served six months of home confinement, paid a $15,000 fine, and served 200 hours of community service. *Id.*

Since completing his sentence, Atkinson has not been convicted of any additional crimes and has no history of violence. *Id.* at ¶¶ 16, 27. He is married and has two grown children. *Id.* at ¶ 3. He continues to operate his recruiting company

2

and, in 2018, opened Atkinson Ergonomic Solutions, Inc., which makes devices that assist hotels with lifting beds for cleaning. *Id.* at ¶ 16.

In his complaint, Atkinson acknowledges that his felony conviction prohibits him from possessing a firearm under both federal and Illinois law. *Id.* at ¶¶ 32–35; *see also* 18 U.S.C. § 922(g)(1); 430 Ill. Comp. Stat. Ann. 65/4(a)(2)(ii), 65/2(a)(1). He alleges, however, that his "unique personal circumstances" make the application of this law to him unconstitutional. [1] at ¶ 38. On January 18, 2021, he sued United States Attorney General Merrick Garland and ATF Acting Director Regina Lombardo in their official capacities, seeking a declaratory judgment that 18 U.S.C. § 922(g)(1), as applied to him personally, unconstitutionally infringes his Second Amendment right to "keep and bear arms" for self-defense at home. [1] at 1–2. Defendants move to dismiss Atkinson's claim based upon binding precedent demonstrating that categorical bans on felons possessing firearms fall outside the scope of the Second Amendment and that prohibiting felons from possessing firearms under § 922(g)(1) is substantially related to the government's compelling interest in preventing violent crime and protecting public safety. [6-1] at 1.

## II. Legal Standards

To survive a motion to dismiss for failure to state a claim, Fed. R. Civ. P. 12(b)(6), the complaint must include sufficient factual allegations to show a plausible right to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, *id.*, the facts in the complaint must present a claim that rises "above the speculative level." *Id.* at 545. "Threadbare

SA4

recitals of the elements of a cause of action, supported by mere conclusory statements" cannot by themselves satisfy Rule 8's requirement that the complaint show the plaintiff is entitled to relief. Fed. R. Civ. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When considering whether the complaint demonstrates a plausible right to relief, the Court accepts all well-pleaded factual allegations as true and views them in the light most favorable to the plaintiff. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). In contrast, "legal conclusions and conclusory allegations . . . are not entitled to this presumption of truth" and should not be considered when deciding on a motion to dismiss. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). If the Court finds, after eliminating any legal conclusions and considering only the plaintiff's factual allegations, that the complaint does not show a plausible right to relief, then the moving party's motion to dismiss should be granted. *Iqbal*, 556 U.S. at 679.

## III. Discussion & Analysis

As he must, Atkinson acknowledges in his complaint that his felony conviction prohibits him from possessing a firearm under both federal and Illinois law. *Id.* at ¶¶ 32–35; *see also* 18 U.S.C. § 922(g)(1); 430 Ill. Comp. Stat. Ann. 65/4(a)(2)(ii). Specifically, federal law prohibits anyone convicted of "a crime punishable by imprisonment for a term exceeding one year" from possessing a firearm. 18 U.S.C. § 922(g)(1). In addition, Illinois residents must obtain a Firearm Owners Identification Card ("FOID card") to possess a firearm, under 430 Ill. Comp. Stat. Ann. 65/2(a)(1),

but individuals with a felony conviction are prohibited from obtaining a card. 430 Ill. Comp. Stat. 65/2(a)(2)(ii). Nevertheless, Atkinson argues that § 922(g)(1), as applied to him, violates his Second Amendment right to possess firearms for purposes of self-defense.

The Second Amendment right to keep and bear arms is "not unlimited": it does not, for example, "protect those weapons not typically possessed by law-abiding citizens for lawful purposes"; nor does it preclude "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Dist. of Columbia v. Heller*, 554 U.S. 570, 595, 625, 626–27 (2008); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010) (noting that "*Heller*, while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," and repeated the "assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons . . . .").

Applying *Heller*, the Seventh Circuit has rejected—at least twice—the very claim Atkinson makes today. In *Kanter v. Barr*, the plaintiff (like Atkinson) pled guilty to one count of mail fraud under 18 U.S.C. § 1341, which, as Atkinson concedes, carries a maximum penalty of twenty years in prison and a $250,000 fine. 919 F.3d 437, 440 (7th Cir. 2019). Kanter was sentenced to 366 days in prison and two years

of supervised release; he was also ordered to pay a criminal penalty of $50,000, and he reimbursed Medicare over $27 million in a related civil settlement. *Id.* After serving his time and paying his criminal penalty, Kanter (like Atkinson) kept his nose clean and did not engage in any further criminal behavior; he (like Atkinson) was married, employed, and did not use illicit drugs, yet federal law prohibited him from owning a firearm. *Id.* at 440, 449. Kanter sued, arguing (like Atkinson) that 18 U.S.C. § 922(g)(1) was unconstitutional as applied to *him*, given his status as a married, employed, nonviolent offender with no other criminal record who did not use illicit drugs. *Id.* at 440, 449. After an exhaustive examination of post-*Heller* cases concerning as-applied challenges to § 922(g), the Seventh Circuit held that "Kanter's serious felony conviction prevents him from challenging the constitutionality of § 922(g)(1) as applied to him," and it rejected Kanter's request for a "fact-specific inquiry." *Id.* at 450.

In *Hatfield v. Barr*, a case decided just a few months after *Kanter*, the Seventh Circuit explained that it rejected Kanter's § 922(g)(1) as applied challenge, "not just because it appears to be inconsistent with the Supreme Court's statements [in *Heller*] but also because fraud is a thought-out crime that demonstrates disdain for the rights of others and disrespect for the law"; "a person convicted of fraud is not the sort of law-abiding, responsible citizen to whom *Heller* referred." 925 F.3d 950, 951 (7th Cir. 2019). But Hatfield argued that § 922(g)(1) was unconstitutional as applied to *him* because his crime was less serious than Kanter's and because he was not sentenced to imprisonment but was instead sentenced to three years' probation for his crime.

6

*Id.* Rejecting the claim, the Seventh Circuit held that the nature of Hatfield's crime was the same as Kanter's: both involved "fraud to get federal benefits to which the applicant was not entitled" and "the maximum penalty for each crime was at least five years in prison, well over the one-year line drawn by § 922(g)(1)." *Id.* at 951–52. Specifically with regard to Hatfield's argument that he was different from Kanter because he got probation and not a term of imprisonment, the court held that "§ 922(g)(1) may be applied to a felon convicted of fraud, whose maximum sentence exceeded a year, even if the actual punishment was less." *Id.* at 952.

The court discussed in detail Hatfield's argument (which Atkinson echoes) that he was somehow less dangerous than the average convicted felon. *Id.* at 952–53. The court theorized that, if it "could know reliably who will be law-abiding, responsible citizens despite felony convictions, the Supreme Court might include them among those protected by the Second Amendment." *Id.* at 952. But, the court held, Hatfield did not "show or even contend that it is possible to predict a felon's future dangerousness." *Id.* Even though certain evidence shows that only 40% of those convicted of nonviolent offenses are caught committing crimes in the future, "40% is still a substantial recidivism rate, and without some way to know who will commit new crimes—and whether those crimes are likely to entail the threat or use of violence—it is not possible to declare that any particular felon could be entrusted with firearms." *Id.* The court then held that, because Hatfield could not "show that it is possible to say whether he, and others like him, are to a constitutionally dispositive degree less dangerous than other felons," he "must accept that the

7

SA8

Supreme Court's norm applies to him. He is not entitled to possess firearms." *Id.* at 953.

*Kanter* and *Hatfield* are dispositive. Atkinson argues that "there are significant differences between the situation in *Kanter* and the instant case that require denial of Defendants' Motion." [8] at 1. But he does not explain what those differences are, and from this Court's perspective, the cases are materially identical: Atkinson committed the same crime as Kanter and was thus subject to the same maximum penalty. And to the extent Atkinson suggests that his sentence to probation somehow sets him apart, *Hatfield* says otherwise.

Moreover, *Kanter* and *Hatfield* foreclose the factual inquiry into an individualized assessment of character that Atkinson seeks. As the Seventh Circuit explained, "without some way to know who will commit new crimes—and whether those crimes are likely to entail the threat or use of violence—it is not possible to declare that any particular felon could be entrusted with firearms. This may be why Congress withdrew funding from the § 925(c) program. No one wants to pay for a program that does not have a prospect of success." 925 F.3d at 952–53. The observation was not novel. The court made the same pronouncement almost a decade earlier in *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010), and repeated it in *Kanter*: "most felons are nonviolent, but someone with a felony conviction on his record is more likely than a non-felon to engage in illegal and violent gun use." 919 F.3d at 448. Although the dissent in *Kanter* accepted the argument that personal characteristics such as marital status, employment status, and the absence of drug

8

use could be used to show a nonviolent felon has a lower risk for committing violent crime, *Kanter*, 925 F.3d at 468–69 (Barrett, J., dissenting), the majority rejected that approach. *Id.* at 449. *Hatfield*—in which the court denied requests for rehearing and rehearing en banc—reiterates the *Kanter* majority's ruling which is, of course, binding on this Court.

Beyond this, the Court rejects Atkinson's suggestion that any individualized assessment would help him. Based upon Atkinson's allegations and his response to Defendants' motion to dismiss, it appears that, when he says he is different from Kanter, he means that, unlike Kanter, he really did not mean to commit a crime. In other words, despite pleading guilty to mail fraud, a crime that included as an essential element his commission of an act with intent to defraud, *e.g., Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 298–99 (7th Cir. 2003), Atkinson suggests that he differs from Kanter because he participated unknowingly in the charged fraudulent scheme (a troubling denial of guilt in light of his prior plea of guilty); he also claims his otherwise clean record shows he does not present a danger to public safety. [8] at 3, 9. In the latter respect he mirrors Kanter, who also committed no further crime, was employed and married, abstained from using illicit drugs, and was nonetheless constitutionally precluded from owning a firearm.[1]

---

[1] Atkinson also suggests that he is exceptional because he only wants a gun for self-defense. But what convicted felon would say otherwise? It is preposterous to think that a felon's representations concerning future use overcome the judicial pronouncements concerning the impossibility of distinguishing "harmless" felons from "dangerous" felons—especially when that felon has been convicted of fraud.

SA10

As to Atkinson's claim that he unknowingly committed fraud, Atkinson pled guilty to mail fraud, which undermines any claim that he acted without the intent to defraud. His crime constituted a serious felony that "reflects significant disrespect for the law" and "carries a maximum penalty of twenty years in prison and a $250,000 fine." *Kanter*, 919 F.3d at 440, 450. By pleading guilty, Atkinson acknowledged that he committed the crime. To the extent he still has a legal way to challenge his plea or conviction, this case is not that vehicle, and his ostensible recantation of his prior guilty plea otherwise undermines his claims here.

In short, the Supreme Court and the Seventh Circuit have consistently sanctioned categorical bans against felons like Atkinson. *Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786; *Kanter*, 919 F.3d at 449 (quoting *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010)). Atkinson's claim that he is somehow special lacks merit; he is no more entitled to possess a firearm than Kanter, Hatfield, or any other convicted felon.

## IV. Conclusion

Based upon binding precedent, Atkinson's claim lacks merit. As a result, the Court grants Defendants' motion to dismiss [6] and dismisses this case with prejudice.

Dated: March 15, 2022

Entered:

John Robert Blakey
United States District Judge

SA11

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| PATRICK ATKINSON, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>JEFFREY A. ROSEN, in his official capacity )<br>as Acting Attorney General of the United )<br>States, and )<br>REGINA LOMBARDO, in her official )<br>capacity as Deputy Director, Head of Agency,)<br>of the Bureau of Alcohol, Tobacco, Firearms )<br>and Explosives, )<br>)<br>Defendants. ) | Case No. |

## COMPLAINT

Plaintiff, PATRICK ATKINSON, by and through LAW FIRM OF DAVID G.

SIGALE, P.C., his attorney, and complaining of the Defendants, JEFFREY A.

ROSEN, in his official capacity as Acting Attorney General of the United States of

America, and REGINA LOMBARDO, in her official capacity as Deputy Director,

Head of Agency, of the Bureau of Alcohol, Tobacco, Firearms and Explosives

("BATFE"), states and alleges as follows:

## INTRODUCTION

Twenty-two years ago, Plaintiff unknowingly played a small part in a

corporate recruiting scam, perpetrated by an employee in the recruiting department

at a large Illinois company, and was convicted of a felony, still his only violation of

the law. He paid a fine, received two years probation, which was ended a year early,

with six months of home confinement. Due to the federal prohibition of felons ever

legally possessing firearms in 18 U.S.C. § 922(g)(1), Plaintiff has been permanently and unconstitutionally deprived of his right to armed self-defense under the Second Amendment.

This action seeks equitable, declaratory, and injunctive relief challenging on an as-applied basis the application of 18 U.S.C. § 922(g)(1) to Plaintiff, who wishes to avail himself of the Second Amendment right as he is not a danger to himself, others, or the public.

Federal law and case precedent make clear there must be felons who qualify for the restoration of their Second Amendment rights. Plaintiff is one of them.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 1346, 2201, and 2202.

2.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B) and (C), as a substantial part of the events and omissions giving rise to the claim occurred, and the Plaintiff resides, in this judicial district.

## PARTIES

3.      Plaintiff, Patrick Atkinson ("Atkinson"), is a natural person residing in Glen Ellyn, Illinois. Atkinson is 62 years old. He is married with two grown children. Atkinson presently intends to obtain an Illinois Firearm Owners Identification Card ("FOID card"), pursuant to the Illinois Firearm Owners Identification Card Act, 430 ILCS 65/1, *et seq*, ("FOID Card Act") so that he may lawfully possess a firearm for self-defense within his own home, and other lawful

2

SA13

purposes such as range training, but is prevented from doing so only by Defendants'
active enforcement of unconstitutional policies complained of in this action.

4.      Defendant, Jeffrey A. Rosen, is the Acting Attorney General of the
United States of America, and is sued only in his official capacity. As Attorney
General, Rosen is responsible for executing and administering laws, customs,
practices, and policies of the United States, and is presently enforcing the laws,
customs, practices and policies complained of in this action.

5.      Defendant, Regina Lombardo, is the Deputy Director, Head of Agency,
of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATFE"), and is sued
only in her official capacity. As Deputy Director, Head of Agency of BATFE,
Lombardo is responsible for executing and administering laws, customs, practices,
and policies of the United States, and is presently enforcing the laws, customs,
practices and policies complained of in this action.

## STATEMENT OF FACTS

*Plaintiff's Background*

6.      Patrick Atkinson is 62 years old and thus over the age of 21, is not
under indictment, has never been convicted of a crime of domestic violence, is not a
fugitive from justice, is not an unlawful user of or addicted to any controlled
substance, has not been adjudicated a mental defective or committed to a mental
institution, has not been discharged from the Armed Forces under dishonorable
conditions, has never renounced his citizenship, and has never been the subject of a

SA14

restraining order relating to an intimate partner. He is married with two grown children.

7.       On October 16, 1998, Atkinson pleaded guilty to, and was convicted, in the Northern District of Illinois Case No. 1:98-CR-00730-03, of one count of frauds and swindles, in violation of 18 U.S.C. § 1341, a Class C felony. The facts underlying the conviction are as follows:

8.       In 1998, Atkinson was an Executive Recruiter with his own company, Waterford Executive Group, which he opened in 1990. One of his clients, his co-Defendant (Zerba), was in the recruiting department at a large Illinois company that specialized in consultants and outsourcing. Atkinson would place actuaries and consultants at the company and receive a consulting fee.

9.       In or around 1998, Zerba offered Atkinson a moonlighting job, where Zerba would find professional candidates, and Atkinson would place them with employers, and they would split the recruiting fee. This happened a couple of times without incident.

10.      A few months later, Zerba sent Atkinson the resume of a recruiting candidate from Virginia. Atkinson tried to place the man in an executive position but could not. Eventually, Zerba told Atkinson he thought the man would be a good fit at his own company, and the man was hired. Atkinson believed he would keep the recruiting fee since the candidate was placed at Zerba's own company where Zerba worked as a recruiter. However, Zerba demanded half of the fee and Atkinson gave it to him.

SA15

11.     Soon thereafter, Zerba sent Atkinson another candidate for placement at Zerba's own company. Atkinson thought it seemed suspicious, and declined.

12.     Soon after that, Zerba called Atkinson and said that he (Zerba) had been fired over referrals and that the police were investigating. When U.S. Postal Inspectors contacted Atkinson, he cooperated fully. Atkinson learned that Zerba was masterminding the scheme with a number of other recruiters, and that Atkinson was unknowingly part of a "hub and spoke" operation, where Atkinson turned out to be just one of multiple spokes.

13.     For his share of one recruiting fee that totaled $6,000.00, Atkinson was sued by Zerba's employer for $150,000.00 for fraud, civil RICO violations, and conspiracy. Atkinson ultimately settled for $45,000.00, and spent $15,000.00 in legal fees.

14.     Atkinson was then charged with mail fraud (frauds and swindles) and quickly pleaded guilty. On February 24, 1999, Atkinson was sentenced to two years of probation with six months of home confinement, a fine of $15,000.00, and 200 hours of community service. He completed all his sentencing terms, and his probation was even terminated a year early, without objection from the Government, on March 7, 2000.

15.     Other than the above referenced offense, Atkinson has never been charged or convicted of any offense which makes him ineligible to possess firearms under 18 U.S.C. § 922(g), or state law, and but for the above referenced charge, no federal law would prohibit Atkinson's possession of firearms.

16.     Atkinson acknowledges that his behavior was wrong. Since that time, he owns two companies: Waterford Executive Group, the aforementioned executive recruiting firm; and Atkinson Ergonomic Solutions, Inc, which was formed in 2018, and which has created a device for lifting hotel beds for greater ease and efficiency of both making the beds, and cleaning underneath them. Atkinson has not been convicted of any further offenses, including any crime of violence or threatened violence.

17.     Atkinson is a law-abiding citizen, and has been for several decades.

18.     However, Atkinson's conviction prohibits him from possessing firearms due to 18 U.S.C. § 922(g)(1).

19.     Had Atkinson been convicted in state court, he could seek relief from his firearms disability under Illinois law, including his firearms disability under federal law, and provide evidence that his rights should be restored. If he was to be successful, Atkinson could lawfully possess firearms under both federal and state law.

20.     However, because Atkinson was convicted in a federal court, the state restoration system does not allow for Atkinson to restore his rights in his particular case.

21.     That federal law provides that Atkinson can petition the Department of Justice to restore his civil rights, however, since about 1992, Congress has prohibited, by appropriation riders, the DOJ from processing petitions to restore civil rights, except for corporations, which does not apply to Atkinson.

SA17

22.     Atkinson has a fundamental right to keep and bear arms in the home for self-defense, and while it may not be a violation of the Second Amendment to presumptively disqualify convicted felons from possessing arms, as applied to Atkinson, who committed a relatively minor non-violent felony, 22 years ago, who has not had any trouble with the law in the intervening 22 years, and who would be eligible to go through a process to restore his civil rights, and thereafter to lawfully possess arms, were he convicted in state court, or were he a corporation. or if the Congress would fund the civil rights restoration scheme adopted at the same time as the federal ban on felons possessing arms, by virtue of his federal conviction, there is no mechanism for Atkinson to restore his civil rights, no matter the merits of his position.

23.     Atkinson does not challenge the ability to presumptively categorically prohibit him from possessing arms, rather, Plaintiff challenges the constitutionality of presumptively categorically prohibiting *him* from possessing arms, while at the same time affording him no opportunity, no matter the merits, short of a Presidential pardon, for an individualized assessment to show he is capable of safely and lawfully possessing arms, and thus restoring his civil rights.

24.     While a categorical felon ban on firearms is "presumptively lawful," that means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge.

25.     There can be no "strong showing" under *Skoien* that permanently disarming Atkinson is an important governmental objective. or that the

SA18

government's claimed objective is substantially related to the permanent prohibition of Atkinson possessing arms in his home for self-defense.

26.     Atkinson is not a violent felon, nor has he a history of violence, so any valid objective to keep firearms out of the hands of violent felons is not met.

27.     Furthermore, as Plaintiff has no history of violence, Defendant's objective is not advanced by prohibiting Atkinson from possessing arms in his home for self-defense.

28.     Atkinson desires and intends to possess firearms for self-defense and for defense of his family.

29.     Owing to his felony conviction, Atkinson is prohibited by Defendants from following through with his intent to obtain a firearm, based on Defendants' enforcement of 18 U.S.C. § 922(g)(1).

30.     Also owing to his felony conviction, Atkinson is unable to obtain an Illinois FOID card, pursuant to 430 ILCS 65/4(a)(2)(ii) and 65/8(c) and (n), and 65/10(c)(4).

31.     Atkinson refrains from possessing a firearm for self-defense and other lawful purposes only because he reasonably fears arrest, prosecution, incarceration and fine pursuant to 18 U.S.C. § 922(g)(1), and 430 ILCS 65/14(c)(3), should he possess a firearm.

SA19

*Defendants' Regulatory Scheme*

<u>*Federal Law*</u>

32.    Title 18, United States Code § 922(g)(1) prohibits the possession of firearms by any person convicted of "a crime punishable by imprisonment for a term exceeding one year." Violation of this provision is a felony criminal offense punishable by fine and imprisonment of up to ten years. *See* 18 U.S.C. § 924(a)(2).

<u>*State Law*</u>

33.    Illinois prohibits the possession of firearms by any Illinois resident without a FOID card.  *See* 430 ILCS 65/2(a)(1).

34.    Illinois prohibits persons from obtaining a FOID card if the granting of same would be contrary to federal law, such as, in the instant case, if one has a felony conviction.  *See* 430 ILCS 65/4(a)(2)(ii), 65/8(c) and (n), 65/10(c)(4).

35.    Possession of a firearm by an Illinois resident without a FOID card, and who is not eligible to obtain a FOID card, is a Class C felony.  *See* 430 ILCS 65/14(c)(3).

<u>**COUNT I –**</u>
<u>**INDIVIDUALIZED, AS-APPLIED CLAIM FOR RELIEF**</u>
<u>**RIGHT TO KEEP AND BEAR ARMS,**</u>
<u>**U.S. CONST. AMEND. II**</u>

36.    The allegations of paragraphs 1 through 35 are incorporated as though fully set forth herein.

37.    Atkinson is a responsible, law-abiding American citizen. He has no history of violent behavior, or of any other conduct that would suggest he would pose any more danger by possessing firearms than an average, law-abiding

9

responsible citizen. Atkinson is unlikely to act in a manner dangerous to public safety, and his possession of firearms would not be contrary to the public interest.

38.     On account of Atkinson's unique personal circumstances, including but not limited to the nature of his felony conviction, the passage of time since that conviction, Atkinson's law-abiding record over the years, his trustworthiness with firearms and the lack of danger that his possession of firearms would pose, it is an unconstitutional violation of Atkinson's Second Amendment rights to apply the firearms prohibition of 18 U.S.C. § 922(g)(1) against Atkinson personally, solely on account of his 1998 fraud conviction.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, PATRICK ATKINSON, respectfully requests that this Honorable Court enter judgment in his favor and against Defendants, and declare and order the following forms of relief:

1.     A declaration that 18 U.S.C. § 922(g)(1) cannot be applied against Patrick Atkinson on account of his 1998 felony conviction under 26 U.S.C. § 7206(1);

2.     A declaration that application of 18 U.S.C. § 922(g)(1) against Patrick Atkinson, on account of his 1998 felony conviction under 26 U.S.C. § 7206(1), violates the Second Amendment to the United States Constitution;

3.     An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation

SA21

with them who receive actual notice of the injunction, from enforcing

18 U.S.C. § 922(g)(1) against Patrick Atkinson on the basis of his 1998

felony conviction under 26 U.S.C. § 7206(1);

4. Costs of suit;

5. Attorney's Fees and Costs pursuant to 28 U.S.C. § 2412; and

6. Any other further relief as the Court deems just and appropriate.


Dated: January 18, 2021 _____/s/ David G. Sigale_____
Attorney for Plaintiff




David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
430 West Roosevelt Road
Wheaton, IL 60187
630.452.4547
dsigale@sigalelaw.com

11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PATRICK ATKINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MERRICK GARLAND, in his official | ) | Case No. 1:21 CV 291 |
| capacity as Attorney General of the United | ) | |
| States, and MARVIN RICHARDSON, in his | ) | |
| official capacity as Acting Director of the | ) | |
| Bureau of Alcohol, Tobacco, Firearms | ) | |
| and Explosives, | ) | |
| | ) | |
| Defendants. | ) | |

<u>NOTICE OF APPEAL</u>

Plaintiff, PATRICK ATKINSON, does hereby appeal to the United States

Court of Appeals for the Seventh Circuit from the judgment of this Court entered on

March 15, 2022, that granted Defendants' F.R. Civ. P. 12(b)(6) Motion to Dismiss

(Dkt. #15), and the decision stating same, entered on March 15, 2022 (Dkt. #14).

By: _____/s/ David G. Sigale_____
David G. Sigale
Attorney for Plaintiff

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
430 West Roosevelt Road
Wheaton, IL 60187
630.452.4547
dsigale@sigalelaw.com

SA23

## CERTIFICATE OF ATTORNEY AND NOTICE OF ELECTRONIC FILING

The undersigned certifies that:

      1.     On April 5, 2022, the foregoing document was electronically filed with the District Court Clerk via CM/ECF filing system;

      2.     Pursuant to F.R. Civ. P. 5, the undersigned certifies that, to his best information and belief, there are no non-CM/ECF participants in this matter.

              /s/ David G. Sigale      
              Attorney for Plaintiff

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
430 West Roosevelt Road
Wheaton, IL 60187
630.452.4547
dsigale@sigalelaw.com

SA24