In the

# United States Court of Appeals

### For the Seventh Circuit

───────────────────

No. 22-1557

PATRICK ATKINSON,

*Plaintiff-Appellant*,

*v.*

MERRICK GARLAND, Attorney General of the United States,
and STEVEN DETTELBACH, Director of the Bureau of Alcohol,
Tobacco, Firearms and Explosives,

*Defendants-Appellees.*

───────────────────

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:21-cv-291 — **John Robert Blakey**, *Judge.*

───────────────────

ARGUED NOVEMBER 8, 2022 — DECIDED JUNE 20, 2023

───────────────────

Before SYKES, *Chief Judge*, and WOOD and SCUDDER, *Circuit
Judges*.

SCUDDER, *Circuit Judge*. Before us is a Second Amendment
challenge to the federal felon-in-possession statute, 18 U.S.C.
§ 922(g)(1). The appeal reaches us in the wake of the Supreme
Court's decision in *New York State Rifle & Pistol Association v.
Bruen*, 142 S. Ct. 2111 (2022). That development is significant

because *Bruen* announced a new framework for analyzing restrictions on the possession of firearms. No longer, the Supreme Court made clear, can lower courts balance interests—of an individual's right to possess a firearm and the state's commitment to promoting personal or public safety—to resolve the constitutionality of the challenged restriction. The new approach anchors itself exclusively in the Second Amendment's text and the pertinent history of firearms regulation, with the government bearing the burden of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

The Supreme Court decided *Bruen* after the district court faithfully applied our precedent and rejected Patrick Atkinson's Second Amendment challenge to § 922(g)(1). The parties' briefing on appeal only scratches the surface of the historical analysis now required by *Bruen*. In these circumstances, we think the best course is to remand to allow the district court to undertake the *Bruen* analysis in the first instance.

**I**

**A**

Before *Bruen*, the Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), defined our approach to resolving Second Amendment challenges to firearms restrictions. Those cases established that the Second Amendment "protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald*, 561 U.S. at 780 (plurality). The right was not, however, "unlimited."

*Heller*, 554 U.S. at 626. Nodding to commentators from "Blackstone through the 19th-century cases," the Court acknowledged that some firearms restrictions could pass constitutional muster. *Id.*

Every circuit court responded to *Heller* by developing the same two-step test. See *Bruen*, 142 S. Ct. at 2126–27. At the first step, the government could defend the challenged restriction by showing that the regulated activity fell outside the scope of the Second Amendment as originally understood. See, *e.g.*, *Ezell v. City of Chicago*, 846 F.3d 888, 892 (7th Cir. 2017). If history proved inconclusive or suggested the regulated activity was not "categorically unprotected," we then conducted a means-end analysis, weighing the severity of the regulation against the ends the government sought to achieve. See *id.* (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011)).

*Bruen* leaves no room for doubt: text and history, not a means-end analysis, now define the controlling Second Amendment inquiry. See 142 S. Ct. at 2131 (emphasizing that, although "judicial deference to legislative interest balancing is understandable—and elsewhere, appropriate—it is not deference that the Constitution demands here [under the Second Amendment]"). Accordingly, when the Second Amendment's "plain text" covers the regulated conduct, the government has only one way to defend the regulation—by proving that it is "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126.

Alongside announcing this standard, the Court offered guidance on what is certain to prove most challenging for the lower courts—how to interpret and define the relevant body of regulatory history. The pertinent question, the Court

explained, is what the Founders understood the Second Amendment to mean. See *id.* at 2136. The Court therefore cautioned against giving too much weight to laws passed before or after the Founding, although a "long, unbroken line of common-law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived, 14th-century English practice." *Id.* Post-Founding history may also play a role in guiding "our interpretation of an ambiguous constitutional provision." *Id.* at 2137 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)).

*Bruen* directs us to canvass these historical periods for similar regulations. When "a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131. So too if the Founders used "materially different means" to address the same problem. *Id.* "And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." *Id.*

To defend "modern regulations that were unimaginable at the founding," the government may reason by analogy. *Id.* at 2132. That does not require pinpointing a "dead ringer"—a "well-established and representative historical *analogue*" will do. *Id.* at 2133 (emphasis in original). The proper inquiry, in short, turns on whether the "modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.*

In *Bruen* itself, the Court applied this inquiry to a New York law that required an applicant to demonstrate "proper cause" to receive a permit for public carry of a firearm. The state's proper-cause requirement did not survive the Court's exacting textual and historical analysis. See *id.* at 2138 (concluding that the state neither "demonstrate[d] a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense" nor identified "any such historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense").

The Court devoted most of its attention to Founding-era laws, while also paying some regard to historical analogues dating as far back as 1328 and as recent as the late 1800s. Many of the laws drawn from this full historical range proved to be poor analogues because they were significantly less restrictive than New York's licensing scheme. A pre-Founding English law, providing that Englishmen could not "go nor ride armed by night nor by day," banned public carry of weapons only when intended to cause terror. See *id.* at 2139 (quoting Statute of Northampton 1328, 2 Edw. 3 c. 3 (Eng.)). Early colonial laws were not only few and far between but also carried the same intent requirement. See *id.* at 2142–43. The New York law, by contrast, banned public carry across the board for citizens who could not convince authorities that they had a special need to carry their weapons publicly.

Some mid-19th-century statutes banned concealed carry, but they typically left the right to open carry intact. See *id.* at 2146–47. Surety statutes—which forced some individuals to post bond before carrying weapons publicly—applied only to individuals likely to pose a threat, yet even those individuals

could carry weapons publicly after posting bond. See *id.* at 2148–50.

At other points, the government's analogues were not enough to show a tradition of similar regulation. Some laws were comparable to the New York statute in severity but were outliers in their time. See *id.* at 2153. Other laws were not enforced often or effectively enough to establish a historical tradition of comparable firearms regulation. See *id.* at 2149–50. Still others impacted a limited swath of the total population, faced little judicial scrutiny, and came too late after the Founding to shed much light on the original understanding of the Second Amendment. See *id.* at 2154–55.

B

Patrick Atkinson filed this lawsuit before *Bruen*. His criminal history included a 1998 guilty plea to felony mail fraud. After maintaining an otherwise clean record for 24 years, he decided he wanted a gun. But 18 U.S.C. § 922(g)(1) bars gun possession for anyone who, like Atkinson, has a conviction for "a crime punishable by imprisonment for a term exceeding one year." So he brought this suit under 18 U.S.C. § 925A to challenge the constitutionality of § 922(g)(1) as the law applied to him.

Relying on our pre-*Bruen* framework, the district court granted a motion from the government and dismissed the case. Our precedent, the district court explained, compelled that outcome, as we had previously rejected challenges to § 922(g)(1) mirroring the one that Atkinson lodged. See, *e.g.*, *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019); *Hatfield v. Barr*, 925 F.3d 950 (7th Cir. 2019). But we did so under the means-end inquiry after determining that the historical record on felons

possessing firearms was "inconclusive." *Kanter*, 919 F.3d at 445–47. Because our precedent moved straight to the means-end analysis, the district court did not conduct the historical analysis that *Bruen* now requires.

## II

The parties' briefing does not grapple with *Bruen*. The best way forward, as we see it, is to return the case to the district court for a proper, fulsome analysis of the historical tradition supporting § 922(g)(1).

### A

For its part, the government would have us avoid a *Bruen* analysis altogether. Invoking *Heller* and *McDonald*, it urges us to uphold § 922(g)(1) based on oft-quoted dicta describing felon-in-possession laws as "presumptively lawful." *Heller*, 554 U.S. at 626–27 & n.26; see also *McDonald*, 561 U.S. at 786 (plurality) ("We repeat [*Heller's*] assurances here."). The government sees further support for its view in *Bruen* itself. See 142 S. Ct. at 2138 n.9 (explaining that "nothing in our analysis should be interpreted to suggest the unconstitutionality" of public carry licensing schemes requiring applicants to pass a criminal background check).

Nothing allows us to sidestep *Bruen* in the way the government invites. Yes, the Court seemed to find no constitutional fault with a state requiring a criminal background check before issuing a public carry permit. But in no way did the Court suggest that its observation resolved cases like the one Atkinson brought challenging § 922(g)(1). We must undertake the text-and-history inquiry the Court so plainly announced and expounded upon at great length.

The government's brief before us includes some historical analysis, but nothing close to what would satisfy the demanding standard set forth in *Bruen*. In addition to some Founding-era commentary, the government mentions that felons like Atkinson were historically subject to execution and estate forfeiture, as well as the loss of other civic rights.

No doubt these historical details may prove relevant on remand. But the government's analysis as a whole falls well short of *Bruen*'s demands. Remember what the Court itself did in *Bruen* after rejecting a means-end approach and announcing the text-and-history standard—it rolled up its sleeves and examined a wealth of laws and commentary spanning several centuries, paying close attention to the enforcement and impact of various regulations. The government points us to only a couple of isolated historical facts and incidents, offering no detail about their application and import. This does not suffice under *Bruen*.

Since oral argument, the government has also urged us to conclude, without any historical analysis, that the plain text of the Second Amendment does not cover felons. See, *e.g.*, *United States v. Sitladeen*, No. 22-1010, 2023 WL 2765015, at *2–5 (8th Cir. Apr. 4, 2023) (relying on circuit precedent and concluding that unauthorized aliens are not part of "the people" protected by the Second Amendment). *Bruen* left this complicated issue unresolved. Although we analyzed the scope of the Second Amendment right before *Bruen*, we have not returned to the issue since then. See *United States v. Meza-Rodriguez*, 798 F.3d 664, 669–72 (7th Cir. 2015) (defining "the people" for purposes of the Second Amendment as members of the national community with substantial connections to the

country). We cannot resolve the issue without the benefit of more substantial briefing on remand.

Atkinson's historical analysis falls short, too. He now argues that § 922(g)(1) is facially unconstitutional because history supports disarming only "dangerous" persons with convictions for "violent" felonies. Alternatively, he urges us to conclude that history requires an individualized assessment of the danger that he poses. To support these contentions, Atkinson leans on Founding-era commentary and various laws disarming politically dangerous groups.

But although Atkinson has shown some support for the idea that a group's "dangerousness" is what mattered to the Founders, he does not provide much historical basis for individualized assessments or for delineating between individuals who committed violent versus non-violent crimes. The distinction is not an obvious consequence of many of the laws that Atkinson, and his amicus especially, discuss. Nor does Atkinson tell us what the Founders would have viewed as a "violent" crime and what evidence they would consider in making that determination.

Aided by the parties' briefing and the benefits of the adversarial process, the district court is best suited to conduct the required analysis in the first instance. As our dissenting colleague underscores, the constitutional issues at stake are weighty. Before we resolve the question before us, the parties should have a full and fair opportunity to develop their positions before the district court in accordance with the principles of party presentation. Our review, which all agree is inevitable, will be better for what transpires on remand in the district court.

### B

Several interrelated and non-exhaustive questions may help focus the proper analysis on remand:

1. Does § 922(g)(1) address a "general societal problem that has persisted since the 18th century?" *Bruen*, 142 S. Ct. at 2131. If this problem existed during a relevant historical period, did earlier generations address it with similar or "materially different means?" *Id.*

2. What does history tell us about disarming those convicted of crimes generally and of felonies in particular? Among other sources, the parties could look to commentary from the Founders, proposals emerging from the states' constitutional ratifying conventions, any actual practices of disarming felons or criminals more generally around the time of the Founding, and treatment of felons outside of the gun context (to the extent this treatment is probative of the Founders' views of the Second Amendment). When considering historical regulations and practices, the key question is whether those regulations and practices are comparable in substance to the restriction imposed by § 922(g)(1). To answer the question, the district court and the parties should consider how the breadth, severity, and the underlying rationale of the historical examples stack up against § 922(g)(1).

3. Are there broader historical analogues to § 922(g)(1) during the periods that *Bruen*

emphasized, including, but not limited to, laws disarming "dangerous" groups other than felons? The parties should not stop at compiling lists of historical firearms regulations and practices. The proper inquiry, as we have explained, should focus on how the substance of the historical examples compares to § 922(g)(1).

4. If the district court's historical inquiry identifies analogous laws, do those laws supply enough of a historical tradition (as opposed to isolated instances of regulation) to support § 922(g)(1)? On this front, the parties should provide details about the enforcement, impact, or judicial scrutiny of these laws, to the extent possible.

5. If history supports Atkinson's call for individualized assessments or for a distinction between violent and non-violent felonies, how do we define a non-violent or a non-dangerous felony? And what evidence can a court consider in assessing whether a particular felony conviction was violent? For instance, can a court consider the felony conviction itself, the facts of the underlying crime, or sentencing enhancements? *Bruen* shows that these distinctions should also have firm historical support. See 142 S. Ct. at 2132–33 (explaining that the court must assess whether modern and historical regulations are "relevantly similar," including in terms of how and why the regulations burden gun rights).

Both sides should cast a wider net and provide more detail about whatever history they rely on. For its part, the district

court may accept amicus briefs to assist with its inquiry and, of course, may benefit from recent decisions from other courts and indeed the analysis embodied in our dissenting colleague's opinion. See, *e.g.*, *post*, at 24–36; *Range v. Att'y Gen.*, No. 21-2835, 2023 WL 3833404 (3d Cir. June 6, 2023) (concluding that § 922(g)(1) is unconstitutional as applied to an appellant convicted of a welfare fraud offense); *United States v. Jackson*, No. 22-2870, 2023 WL 3769242 (8th Cir. June 2, 2023) (rejecting an as-applied challenge).

Although the government must conduct a more substantial historical analysis on remand, it may also develop its contention that the plain text of the Second Amendment does not protect felons and other offenders impacted by § 922(g)(1).

## III

We recognize that asking these questions is easier than answering them. As our dissenting colleague likewise emphasizes, the historical analysis required by *Bruen* will be difficult and no doubt yield some measure of indeterminacy. The parties may be unable altogether to find answers to certain questions, may find incomplete information in response to others, and perhaps in some instances may identify substantial historical information pertinent to one or another dimension of the required inquiry. In the end, the district court (and surely us too, when this case or another one like it returns) will have to give the best answer available to whether the government has carried its burden of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127.

No. 22-1557                                                    13

For these reasons, we VACATE and REMAND for further
proceedings.

WOOD, *Circuit Judge*, dissenting. The question before us in this case could not be more important: may individual rights under the Second Amendment be curtailed or denied only on the basis of a granular, case-by-case analysis, or does Congress have the power to enact categorical restrictions? And if some categorical limits are possible and others are not, what sorting principle may or must we use to separate the permissible from the impermissible?

My colleagues have taken the position that we need further input from the district court before we can tackle the present case. With respect, I do not agree with them. The issue before us is whether 18 U.S.C. § 922(g)(1) is compatible with the Second Amendment. That statute prohibits those convicted of a crime for which the punishment exceeds one year in prison (usually felonies) from possessing a firearm or ammunition. This is a pure question of law, and our consideration is therefore *de novo*. If we think that we would benefit from further exploration of the issue, in light of the intervening decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), nothing prevents us from asking the parties to submit supplemental briefs. Exactly that process occurs when we are confronted with an unfamiliar question of foreign law—another setting in which we have the authority to conduct our own research. See Fed. R. Civ. P. 44.1. Just so here: we must decide whether, in light of the textual and historical materials to which *Bruen* directs us, section 922(g)(1) is constitutional. Remanding this case to the district court will not reduce our responsibility to evaluate that question independently when the case inevitably returns to us.

My own assessment of the materials that now govern Second Amendment questions per *Bruen* convinces me that the

categorical prohibition created by section 922(g)(1) passes muster under the Constitution. I would therefore affirm the district court now, without saddling it with a Ph.D.-level historical inquiry that necessarily will be inconclusive.

## I

Section 922(g)(1) makes it unlawful "for any person who has been convicted in any court of [] a crime punishable by imprisonment for a term exceeding one year … to ship or transport … or possess … any firearm or ammunition." Several questions come immediately to mind, including whether the weapon (or ammunition) being shipped, transported, or possessed falls within the scope of the Second Amendment, and whether the accused has committed the type of predicate offense to which the statute refers. I will say only a few words about those antecedent questions, because they do not play a significant role in the present case. I will then move on to the heart of the matter: whether the individual right to bear arms recognized in the Second Amendment can be regulated by Congress in the manner we see in section 922(g)(1).

At a high level of generality, few would disagree with the proposition that not all weapons qualify as the "arms" to which the Second Amendment refers—that is, weapons that ordinary people are entitled to use for purposes of self-defense or sport. Contrary to the textualist position, it is also plain that this is not an amendment whose meaning was frozen in time upon its addition to the Constitution. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Court made the latter point clear when it said that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, *even those that were not in existence at the time of the founding.*" 554 U.S. at 582 (emphasis added). But that did not extend

Second Amendment protections to everything that could be described as a weapon. Courts are compelled to draw lines, and argument is always possible near the boundaries. But some things are relatively clear. No one doubts that handguns are "bearable arms" and thus the type of weapon covered by the Amendment. Well beyond the other side of this imaginary line are devices such as rocket-launchers or nuclear warheads, both of which are reserved for the exclusive use of the military. Because Atkinson wants the right to have and to use weapons that, as far as this record shows, fit comfortably within the Amendment, I will assume for purposes of this dissent that the issue before us has nothing to do with the *type* of weapon involved here.

The nature of the offense that has swept Atkinson under the prohibition in section 922(g)(1) is another matter. As I noted a moment ago, the statute disqualifies *all* persons who have been convicted in *any court* of "a" crime punishable by more than a year's imprisonment. (Interestingly, the term "any court" does not include courts of foreign countries. See *Small v. United States*, 544 U.S. 385 (2005).) The relevant offenses do *not* include "any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices"; nor do they include "any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less," or convictions that have been expunged or pardoned. 18 U.S.C. § 921(a)(20). Convictions for which civil rights have been restored also do not count, unless there is an express provision exempting firearms from the restoration. *Id.*; see generally *Buchmeier v. United States*, 581 F.3d 561 (7th Cir. 2009) (*en banc*). But those limitations do not help Atkinson. His

predicate offense was a serious federal crime: felony mail fraud in violation of 18 U.S.C. § 1341, which is punishable by up to 20 years' imprisonment. He pleaded guilty in 1998 to defrauding one of his clients by paying $6,000 to an insider involved in a hiring transaction. His sentence was a light one—six months' home confinement, two years' supervised release, and a $15,000 fine.

In his briefing before this court, Atkinson urges us to regard this as a trivial offense, not worthy of permanent loss of Second Amendment rights. He also suggests that his own participation in the fraudulent scheme was "unwitting" and that we should account for his relative lack of culpability. At the same time, he claims that he fully accepts responsibility for his actions and his status as someone convicted of a felony. Even so, he urges, the Second Amendment does not support the categorical exclusion of all felons from gun possession, ownership, or use.

Atkinson's invitation for us to conduct an independent evaluation of the gravity of his own crime for purposes of section 922(g)(1) is out of bounds, in my view. The Judiciary cannot be in the position of looking at prior offenses identified by Congress and second-guessing Congress's decisions both with respect to criminalization and to sentencing exposure. Should a judge who believes that we should attack this nation's illegal drug problem with addiction treatment rather than criminal penalties rule that drug dealers did not commit sufficiently heinous crimes to deserve the loss of their gun rights? Should a judge ignore a crime such as tax evasion if it is committed by a person who has fallen on hard times, financially speaking, and who is trying to find money for her family? I see no principled way to go down that road. Worse,

Atkinson seems to be inviting us to consider the particular facts of every case, to see if the conduct underlying the conviction ought to support restrictions on gun rights. Such a system would impose impossible burdens on courts and prosecutors and would lead to an arbitrary patchwork of decisions—as far from the rule of law as one could imagine.

With that in mind, I will continue on the assumption that Atkinson's second argument is the serious one in this case: whether a permanent restriction on Second Amendment rights for all felons lies within Congress's powers, or if instead we must go offense-by-offense, as we do under the categorical approach for armed career criminals, see 18 U.S.C. § 924(c), and decide which felony convictions call for that measure. The Supreme Court's guidance satisfies me that the Court recognizes that certain across-the-board disqualifications from gun ownership have always been part of the U.S. approach to gun regulation and thus have the kind of historical support that *Bruen* demands. I say this in full awareness of the fact that Supreme Court decisions are not to be read as statutes. This court noted the problem with such an approach in *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (*en banc*) (upholding 18 U.S.C. § 922(g)(9) against a Second Amendment challenge), and I have no quarrel with the admonition to treat language in opinions as informative rather than as a comprehensive code.

## II

So what has the Supreme Court told us about general limitations on the right to bear arms? I would begin with its well-known passage in *Heller*:

Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. … For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. … Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

554 U.S. at 626–27 (citations omitted); see also *Bruen*, 142 S. Ct. at 2128 (repeating the reference to Blackstone). The *Heller* Court went on to recognize "another important limitation on the right to keep and carry arms"—it was limited to "the sorts of weapons" that were "in common use at the time." 554 U.S. at 627. Let me pause for a moment on the phrase "in common use." In *Heller*, the Court explained it this way: "[*United States v. Miller*, 307 U.S. 174 (1939)] said … that the sorts of weapons protected were those 'in common use at the time.' 307 U.S. at 179. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 627.

The Court's reference to historical tradition indicates that the relevant time for the "common use" inquiry is when the

Second Amendment was adopted, not when the current law-suit arose. Otherwise the weapons that qualify as being in "common use" would vary over time in capricious ways. Think about the modern pistols that have been available since the 1980s. Presumably someone who wanted to own and carry such a pistol during the first year it was on the market would have had a hard time showing "common use"—it was a new product, after all. But in time it became very popular. The early purchasers of such a pistol do not have to wait for that popularity before they can rely on Second Amendment protections; rather, they would have analogized it to the smaller, pistol-style weapons in common use in 1791. What *Heller* and *Bruen* demand is not a headcount of how many people today own a certain firearm or how many are sold. Instead, those decisions ask which historical analogue the modern weapon most strongly resembles. If the analogue is one that people were entitled to use, then that part of Second Amendment analysis is satisfied; if instead the item is more like the "dangerous and unusual weapons" of yore, then it is not one of the "arms" protected by the Amendment.

## A

Let's turn, then, to those "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 626–27, to see if they hold the key to the resolution of Atkinson's case. The first point to make is that nothing in that list may be justified by the means/end test that *Bruen* disapproved. But these were "longstanding prohibitions" and thus fall squarely within the historical test to

which courts must now confine themselves. I accept for present purposes that this passage from *Heller* alone is not enough to resolve Atkinson's case, since (as we noted in *Skoien*) the Supreme Court may have been merely observing that the *Heller* case did not require it to evaluate those restrictions. It was able to save them for another day, and in this case, we have reached that day.

The "who" question presented by our case—who may be subject to restrictions on their Second Amendment rights—is now governed by *Bruen*'s framework. *Bruen* does not slam the door on all gun regulation; it acknowledges that a given regulation or restriction may be defended if it is "consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. This approach poses enormous challenges to the district and circuit courts of this country, not to mention the myriad state courts that must also deal with the Second Amendment in light of *McDonald v. City of Chicago*. See 561 U.S. 742, 750 (2010) (holding that the Second Amendment applies to the states, through incorporation under the Fourteenth Amendment). Every unit of government, from the smallest village or municipality, through counties and parishes, states, federal enclaves, and the federal government itself, has had something to say about guns. Many of them have laws going back to the origins of this country. What are we to make of all this?

History does not write itself. Historiographers would caution us that the choice of sources, facts, organizational principles, and theories, all contribute to the final narrative. See, *e.g.*, "Historiography," Merriam-Webster, https://www.merriam-webster.com/dictionary/historiography (defining historiography as "the writing of history, especially: the writing of

history based on the critical examination of sources, the selection of particulars from the authentic materials, and the synthesis of particulars into a narrative that will stand the test of critical methods"). Only a professional historian would know how to evaluate often-conflicting claims about the social, cultural, and legal landscape of an earlier period, and that person likely would not jump to any conclusions without devoting significant time to an evaluation of original sources.

In *Bruen*, the Court optimistically said at a few points that all that was needed was a search for analogues—something that common-law judges do every day. But a closer look at the opinion shows that it did not have something quite that simple in mind. Some historical examples proffered by the parties met with its approval; others were dismissed as not being sufficiently widespread, or sufficiently analogous to the modern situation, to be useful. We are left with something not much better than the Goldilocks solution: history can't be viewed too specifically, and it can't be viewed too generally. It must be, like the bed, the chair, or the porridge, "just right." See Jake Charles, *Bruen, Analogies, and the Quest for Goldilocks History*, Duke Center for Firearms Law Blog (June 28, 2022). And that "perfect" length, or height, or temperature will remain in the eye of the beholder, or perhaps the final court to consider the matter.

Lest I be accused of exaggerating, let me give a few examples of the fine lines courts are now being asked to draw. First, *Bruen* tells us that the historical analogue must be neither too old nor too recent. It adds that the most persuasive analogous regulations are those enacted or in place at the time the Second Amendment was ratified (1791) or those that date from the adoption of the Fourteenth Amendment (1868)

(presumably if the regulation at issue comes from a state entity rather than the federal government). As Justice Thomas reminded us, "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" *Bruen*, 142 S. Ct. at 2126 (quoting *Heller*, 554 U.S. at 634–35). Next, the historical analogues must be abundant, though they need not appear in every jurisdiction. Being able to point to three colonial regulations is not enough to demonstrate a regulatory "tradition," *id.* at 2142–43, even if the three colonies in question represented nearly a quarter of the original 13 and accounted for almost half the country's population. Furthermore, the regulations must have been "actually" enforced by the authorities, though we do not know what ratio between incidence of the regulated action and prosecutions is enough to make enforcement "actual." And laws that were "short lived" "deserve little weight." *Id.* at 2155.

Having said all that, the Court gave back with the left hand a little of what it had taken away with the right: it stressed that "analogical reasoning under the Second Amendment is neither a regulatory straitjacket nor a regulatory blank check." *Id.* at 2133. It assured readers that courts do not need to track down a "historical twin" that corresponds to a modern regulation in order for a restriction on firearm possession to pass constitutional muster. We must ask instead "how and why the regulations burden a law-abiding citizen's right to armed self-defense" and decide whether that "how" and "why" are relevantly similar to the historical antecedents. *Id.* (Note once again that the assumption is that the citizen is "law-abiding." The Court said nothing about what makes someone law-abiding or not.) A lower court judge could be forgiven for thinking that there is a great deal of play in these joints.

B

Taking *Bruen* at its word, as we all must in our hierarchical judicial system, what I see in the nation's history is a nuanced approach toward gun possession, ownership, and use. The Second Amendment's history and tradition are steeped in a rich regulatory background. For what it is worth, I would say exactly the same thing about the First Amendment, which the Court has often equated to the Second Amendment. Although Justice Hugo Black was famous for taking a strict view of the First Amendment, insisting that the words "NO LAW" with which it begins meant literally "NO LAW," the truth is that the First Amendment has always been circumscribed by limiting principles. The Supreme Court understands that a person cannot shout "FIRE" in a crowded theater, see *Schenck v. United States*, 249 U.S. 47 (1919); that "fighting words" are not protected, see *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942); that a person who credibly issues a verbal threat to kill the President may be prosecuted, see *Rankin v. McPherson*, 483 U.S. 378 (1987); that obscenity and child pornography do not qualify as protected speech, see *Miller v. California*, 413 U.S. 15 (1973) (obscenity), *New York v. Ferber*, 458 U.S. 747 (1982) (child pornography); and that the First Amendment did not totally displace common-law libel and slander, see *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). The Second Amendment is the same: while it robustly protects the right of law-abiding citizens to keep and bear arms for self-defense, sport, and other lawful uses, it does not categorically displace all other laws—not laws regulating the terms and conditions that govern lawful firearm ownership, including the types of weapons that may be possessed, and not laws governing the situations under which those pre-existing rights may be forfeited.

C

History and tradition bear this out. Gun ownership and use in this country (both before and after the adoption of the 1787 Constitution) have always been subject to reasonable regulations. Joseph Blocher & Darrell A.H. Miller, *The Positive Second Amendment: Rights, Regulation, and the Future of* Heller 4 (2018) ("[T]he [Second Amendment] protects some private purposes, and … it is and has always been subject to regulation."). Moreover, while I recognize that we must not allow the prefatory clause of the Second Amendment—the one that highlights the role of a well-regulated militia—to assume undue importance, it is equally true that we are not at liberty to delete words from the Constitution. History demands that we give each part appropriate weight.

Long before the United States of America was a gleam in anyone's eye, there was a close relation in England between, on the one side, the right of citizens to have arms and, on the other side, their responsibility to answer the King's call for armed forces when the need arose. Indeed, as Joyce Lee Malcolm writes, originally the "bearing" of arms was a duty owed to higher political authorities, not an individual right against those authorities. See Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 1 (1994). The intertwining of right and duty had an effect on the types of arms people were allowed to keep. Arms that, in times of need, could be used in the militia, could also be retained at home for self-defense and for hunting (though not poaching—the latter would result in the deprivation of the right to keep the weapon). And it was from those seeds that the individual right recognized in *Heller* originally grew. But note how closely related to militia service the scope of the right is. As

one commentator noted, there is no way to disentangle the private right to bear arms from the history of the King's right to call upon a civilian militia to protect the state. Saul Cornell, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 503 (2004).

As far back as the Middle Ages, Englishmen were required to participate in local peacemaking. Malcolm, *To Keep and Bear Arms* at 1 (who describes this duty as existing since "time out of mind"). As Malcolm notes, "[t]he requirement to raise a 'hue and cry' dates from at least the thirteenth century. A writ of 1252 explained that upon the raising of the cry neighbours [*sic*] were to turn out with weapons they were bound to keep." *Id.* at 181 n.4. This operated as an obligation or a duty, not as a right to own weaponry. It was also seen as a tax of sorts, because subjects were required to use their own funds to purchase and maintain their weapons. The feudal lord monitored their compliance, and it was the lord (later the governing political authority) who had the right to call upon the militia to its defense. This right included the power to govern private arms—who had to keep weapons, what those persons had to keep, and how the weapons were stored.

By the time the colonies were organizing themselves into the United *States* of America, the status of the right had also evolved in England. In particular, as the Supreme Court pointed out in *Bruen*, England experienced its Glorious Revolution in 1688, in the wake of James II's tumultuous reign. The next year, with William III and Mary II securely on the throne, Parliament passed the Declaration of Rights, which enshrined basic civil liberties and royal succession, as well as parliamentary privilege. See Eng. Bill of Rights 1 Will. & Mar. Sess. 2, c. 2 (1689). Like the Magna Carta, the Declaration is one of the

central documents that makes up Britain's unwritten constitution. One of the "ancient rights and liberties" it mentions is the following: "*Protestants* may have arms for their defence suitable to their conditions and *as allowed by law*." *Id.* at Sess. 2, c. 2, cl. 7 (emphasis added). Not quite a ringing endorsement of an untrammeled right to keep and bear arms, it instead builds in the idea that this right exists "as allowed by law." The purpose of this clause, according to historians, was to leave no doubt that it was Parliament that had regulatory power over firearms, not the Crown. See Carl T. Bogus, *The Hidden History of the Second Amendment*, 31 U.C. Davis L. Rev. 309, 379–82, 384 (1998). Parliament asserted this regulatory power in response to the turmoil surrounding James II's efforts to disarm Protestants. The fear of James's Catholicism was a major factor behind Parliament's decision to turn the throne over to William of Orange and Mary, James II's Protestant daughter, thereby ending the Stuart dynasty and ushering in the Hanovers. But it bears repeating: the concern was about *who* would regulate firearms—not whether they could be regulated.

There is much more one could say about these historical practices, but for present purposes it is enough to note that, by the time of William and Mary, Parliament claimed the right to control weapons designed for the militia but held in private hands. It is also worth noting that the standing British Army was founded in the mid-17th century, around the same time.

When the time came to draft our own Bill of Rights, the militia tradition, as well as the role of standing armies, was a central concern for the American colonists. James Madison, in Federalist 46, wrote that any federal army could be checked by the (populist) militia. This was a point that reassured those

who feared the power of the federal government to compromise the sovereignty of the states. It is notable that the Declaration of Independence includes, among the list of grievances against King George III, that "He has kept among us, in times of peace, Standing Armies without the Consent of our legislatures."

These concerns persisted even as the need for a standing army became clear. During the Revolutionary War, George Washington was continually begging the Second Continental Congress to professionalize the army. He did so because the colonial militias were less reliable; they had short periods of enlistment and members were free to return home when they chose. But Congress repeatedly resisted his importuning. Furthermore, the delegates at the Constitutional Convention had just lived through Shays's Rebellion, an uprising of farmers protesting debt-collection courts in Massachusetts. The leader, Daniel Shays, led a group of 4,000 rebels that wanted to seize the state armory; the confederal government was unable to muster a response and so the protestors were stopped by the Massachusetts State militia and a privately funded local militia. This incident was quite salient for the drafters of the Bill of Rights, who feared future rebellions: people were looking for assurance that the new Constitution would provide a framework for an effective national defense. See Paul Finkelman, *A Well Regulated Militia: The Second Amendment in Historical Perspective*, 76 Chi.-Kent L. Rev. 195, 196 (2000). These competing goals, of national security and the preservation of state sovereignty, set the stage for the ratification debates. And in borrowing from the English Declaration of Rights when crafting the Second Amendment, the primary dispute among the Founders was over *which* political unit

would regulate the civilian militias, not whether regulation was entirely off the table.

For example, the Anti-Federalists expressed fears about the power of the new federal government. The Pennsylvania Anti-Federalists proposed several constitutional amendments to check federal power and the threat of the standing federal army. Some of those amendments were designed to address private weapons ownership, but many were focused on the proper allocation of power. The topics included: (1) the right of self-protection through the ownership of weapons; (2) the right to serve in the militia; (3) the right to hunt and fish; (4) the prevention of a standing army; (5) the power of Congress over the states; and (6) the power of the states to control their own armies or militias. Finkelman, *A Well Regulated Militia*, at 208–09. Although private rights were surely implicated in these proposals, so too was state sovereignty and the power of the state to control the militia. Anti-Federalists feared that the militia "would be under control of the president and the Senate" (rather than the states), and that the national government might even destroy the militia. *Id.* at 224.

Other militia-related concerns that were reflected in the Second Amendment were, from a modern perspective, more shameful. Southern states feared that federal control of armed force might compromise their ability to deal with rebelling slaves. See Bogus, *The Hidden History of the Second Amendment*, at 332–34. Those same states relied on (and wanted to continue relying on) their militias to control the growing population of enslaved Black people. One author observed that many Southern militias "were transformed into slave patrols." Blocher & Miller, *The Positive Second Amendment* at 36 (quoting Adam Winkler, *Gunfight: The Battle Over the Right to Bear Arms*

*in America* 133 (2009)). They accordingly wanted to ensure their ability to police their enslaved populations by retaining control of their militias.

The pre-constitutional understanding reflected in the Second Amendment thus had two key elements: the history of the institution of a civilian militia in the Anglo-American tradition; and the individual right to own, carry, and use "arms." The public meaning of the Amendment thus includes elements of both sources. The individual right existed, to be sure, but it was subject to regulation, as the Constitution itself expressly notes. The federal government was given the power to "call[] forth the Militia to execute the Laws of the Union, suppress Insurrections, and repel Invasions," see U.S. Const. art. I, § 8, while the states retained their police power over state militias and were empowered to prevent federal disarmament of individual citizens. This structure makes gun laws all but inevitable, and indeed, at the time the Constitution was written (1787) and the Second Amendment was ratified (1791), laws regulating gun possession and use were ubiquitous in the new country.

## D

Out of this tradition, one can find a vast and diverse array of gun laws stretching from the colonial period, through the Founding Era, through Reconstruction (when the Fourteenth Amendment was added to the Constitution and ultimately made the Second Amendment applicable to state regulation), up to the present day. This is what makes up the text, history, and tradition to which *Bruen* directs us. And text, history, and tradition all point in the same direction: firearms have always been regulated in precisely the ways that concern us in the third decade of the 21st century. That includes what types of

weapons may be owned privately; what formalities may or must accompany the purchase of weapons; and which groups of people are categorically restricted from firearm ownership and use, on account of such disqualifying factors as mental health, criminal record, loyalty, and character. Naturally, regulation on any of these grounds cannot be a pretext for measures that would impair the rights of law-abiding, mentally stable, mature members of the polity. But that does not mean that every restriction must be assessed on a person-by-person basis, any more than the First Amendment demands that the right to have and produce child pornography must be assessed on an individual basis. Nor does it mean that categorical restrictions are not subject to independent constitutional provisions. The days are long gone when the legislature can prohibit Catholics from having guns (as Parliament did during the Stuart era), and it would be equally reprehensible to ban gun ownership based on race, sexual orientation, disability, or other protected characteristics.

A closer look at the types of regulation that were pervasive in the states in the late 18th century supports this conclusion. Around the time of the American Revolution through the drafting and adoption of the Constitution and the Bill of Rights, gun regulations covered three principal topics: (1) storage, (2) militias, and (3) loyalty. There was robust regulation surrounding the storage and transport of gunpowder. These laws were "enacted to protect the growing population centers, such as Boston, Philadelphia, and New York City." Cornell, *A Well Regulated Right*, at 511–12. The laws included limits on the amount of gunpowder a person could possess, rules about where powder could lawfully be stored, and laws for safe transport. *Id.* These laws also relied on state police

powers to require forfeiture of firearms that were improperly stored. *Id.* at 512.

The militia laws in the 18th century were both extensive and comprehensive. They dictated who was expected to serve in the militia, as well as the obligations that accompanied that service. *Id.* at 509. (And always recall that the militia was seen as the alternative to the dreaded standing army—it was an alternative much closer to the people and much less likely to support an out-of-control Executive.) Those subject to militia service had to turn out for regular musters, had to possess the required equipment, and were subject to regular arms inspections. *Id.* at 509–10.

Finally, loyalty oaths did not die with the 1689 English Declaration of Rights or with the passage of the colonists to the New World. During the American Revolution, several states passed laws providing for the confiscation of weapons owned by persons who refused to swear an oath of allegiance to the state or to the United States. *Id.* at 506.[1] The practice of disarming those whose loyalty was questionable continued after the Revolution. Those who refused to swear to a loyalty oath were forced to deliver their weapons to the state. *Id.* at 507–08.

Looked at another way, these laws touched on six distinct areas of regulation. See Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443 (2009). Each of

---

[1] See, *e.g.*, 1778 Pa. Laws 123, ch. LXI, § 5 (requiring those who refused to take an oath to forfeit their arms and ammunition); Act of May 5, 1777, ch. 3, 9 Hening's Statutes at Large 281, 281–82 (Virginia law disarming those who refused to give "assurance of Allegiance").

these types has existed throughout American history—notably, at the time of the Founding and in the mid-19th century, the critical times identified in *Bruen*:

    a) The "what": restrictions on the kinds of weapons that could be privately possessed. *Id.* at 1475.

    b) The "who": restrictions on who was allowed to own weapons. *Id.* at 1493.

    c) The "where": restrictions on the places in which weapons could be carried. *Id.* at 1515.

    d) The "how": restrictions on places weapons could be stored. *Id.* at 1534.

    e) The "when": restrictions on the times during which weapons could be carried. *Id.* at 1535.

    f) Miscellaneous: regulations focused on licensing, permitting, and sales. *Id.* at 1542, 1545.

### III

    This overview has barely scratched the surface of the outpouring of scholarship on the origins and meaning of the Second Amendment, but it is enough to permit me to move on to the task *Bruen* has given us: to demonstrate that the statute under consideration, 18 U.S.C. § 922(g)(1), is "consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. This, as I noted earlier, can only be a question of law, just like any determination of the meaning of a constitutional provision or a statute, and just like the determination of the meaning of a foreign law, see Fed. R. Civ. P. 44.1.

    The assessment of any gun regulation should begin with a look at the type of measure under consideration: to use Professor Volokh's taxonomy, is it a "what, who, where, how, or

when" regulation? Once we know that, we can begin the task of identifying the proper historical analogues. For example, felon disarmament is a "who" restriction. That directs us to historical restrictions on the classes of persons who were allowed to own or possess guns. In addition, one needs to look at the regulatory method the statute embodies: total disarmament for life; disarmament for a term of years; qualified rights to have the weapon with proper sureties; restrictions on particularly sensitive places (courthouses, churches, schools) or times or manner (open-carry, concealed-carry). Throughout all of this, one must also bear in mind that *Bruen* does not demand historical "dead ringers." It is enough to identify a problem with private gun ownership and find the relevantly similar type of solution that was thought to be adequate by our forebears.

*Bruen* also asks courts to focus on "how and why the regulation burdens a law-abiding citizen's right to armed self-defense." 142 S. Ct. at 2133. If a certain burden was understood to be acceptable in the period immediately preceding independence, going up to 1791 when the Bill of Rights was adopted, then we are safe in concluding that the pre-existing right enshrined in the Second Amendment incorporates that qualification.

Applying that approach, one sees that the courts have long recognized that "[t]he preservation of the public peace, and the protection of the people against violence, are constitutional duties of the legislature, and the guarantee of the right to keep and bear arms is to be understood and construed in connection and in harmony with these constitutional duties." *Hill v. State*, 53 Ga. 472, 377 (1874); see also Joseph Blocher & Reva B. Siegel, *Guided by History: Protecting the Public Sphere*

*from Weapons Threats under* Bruen, 98 N.Y.U. L. Rev. __ (forth-coming 2023) at 8.

With the open-mindedness that the historical approach inherently reflects, we have not only the right, but the obligation, to look carefully at the record behind the felon disentitlement statutes. That record reveals that, since the founding, governments have been understood to have the power to single out categories of persons who will face total disarmament based on the danger they pose to the political community if armed. That presumptive power is on display in the loyalty oath laws previously discussed, and in the laws that disarmed persons found guilty of treason and members of native tribes.[2] Though some of those laws would no longer pass muster under the Equal Protection Clause, they reveal conclusively the scope of governmental power that was understood to exist at the time the Second Amendment was adopted. This power allowed the creation of categorical restrictions without any case-by-case escape hatch. Section 922(g)(1) does precisely what statutes have been doing since the mid-18th

---

[2] For the laws regarding the disarmament of native people, see, *e.g.*, 1723 Conn. Acts 292 (preventing the sale of firearms to Indians); 1757–68 Md. Acts 53, ch. 4, § 3 (same); 1763 Pa. Laws 319, § 1 (same); Laws of the Colony of Massachusetts 492 (1769) (same); Statutes of the Mississippi Territory, Indian Intercourse, § 9 (1807) (same); 1844 Mo. Laws 577, ch. 80, § 4 (same); 1853 Or. Laws 257, § 1 (same); Statute Law of the State of Florida, For the Prevention of Indians Roaming at Large Throughout the State, § 1 (1847) (authorizing the seizure of arms from Indians found beyond reservation borders). For other laws disarming an entire category of persons, see, *e.g.*, 1776 Pa. Laws 11, § 1 (disarming all non-associators, the American colonists who refused to sign militia association charters); 1787 Mass. Acts 555, ch. IV (disarming all persons found guilty of treason or aiding rebellion, even after pardon by the governor and an oath of allegiance).

century. It identifies the group of persons deemed dangerous to the political community—those convicted of the defined felonies—and it makes it unlawful for them to possess a fire-arm.[3] To the extent people in that group want to contest the suitability of the dangerousness label to their situation, that is once again an equal protection argument and not an argu-ment about the scope of government authority under the Sec-ond Amendment.

Though I am satisfied with these historical analogues, I understand that there remain several open questions about how to evaluate today's gun laws. The Supreme Court's anal-ysis in *Bruen* could not have been intended to be the last word on historical analysis relevant to the Second Amendment. In-stead, it set the methodological stage. There have been schol-arly criticisms of its assumption that three colonial-era regu-lations do not suffice to establish a historical tradition and its decision not to give any weight to the territorial laws. These critiques may be well taken, but it is not my purpose today to confront them. They can be useful to a lower-court judge in-sofar as they highlight what evidence is needed and why the *Bruen* majority found the record in that case insufficient to save the New York law in question. If three colonies out of 13 isn't enough, then what about four? Would the case have been different if population had been emphasized instead of polit-ical units? Given that territories were subjected to the

---

[3] Relief from that disability is possible through executive clemency. In addition, there is a mechanism that Congress has never chosen to activate that would permit the Attorney General to restore a person's gun rights. See 18 U.S.C. § 925(c). While we certainly would have a different case be-fore us if section 925(c) were available, my argument does not depend on its existence.

Constitution and the Bill of Rights even before the Fourteenth Amendment, what do the territorial laws tell us about legislating under the dictate of those documents? See Andrew Willinger, *The Territories Under Text, History, and Tradition*, 101 Wash. U. L. Rev. __ (forthcoming 2023) at 27. Taking the Court at its word, new historical research should be welcome—just as it was when Justice Brandeis wrote *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) and highlighted what was then new research on the Rules of Decision Act.

As other courts have begun to apply *Bruen*, this need for further research and further guidance has become clear. The Third, Fifth, Eighth, and Eleventh Circuits have all published precedential opinions discussing whether a challenged gun law is consistent with *Bruen*'s history and tradition test. See *Range v. U.S. Attorney General*, -- F.4th -- (3d Cir. 2023) (*en banc*) (in an as-applied challenge, enjoining enforcement of section 922(g)(1) against someone who was convicted of a single, non-violent offense of making false statements on a food stamp application); *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023) (holding section 922(g)(8)—which makes it unlawful to possess a firearm if under a court order related to domestic violence—unconstitutional); *United States v. Jackson*, -- F.4th -- (8th Cir. 2023) (upholding section 922(g)(1) as applied to people with prior drug felony convictions); *United States v. Sitladeen*, 64 F.4th 978 (8th Cir. 2023) (upholding section 922(g)(5)(A) which makes it unlawful for those who are illegally in the United States to possess a firearm); *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317 (11th Cir. 2023) (upholding a Florida law that requires the purchaser of a gun to be 21 years old).

These cases and their varying outcomes illustrate the challenges created by *Bruen*—the Supreme Court threw down a

gauntlet, and it is our job to take it up. For example, considering only the question raised by section 922(g)(1), four courts have come out four different ways on its constitutionality. In Atkinson's case, the majority is directing the district court to develop the historical record, without any notion of how much is enough. The Eighth Circuit conducted the evaluation in much the manner I suggest, noting the presumptive power to disarm categories of persons deemed dangerous, as illustrated in laws that disarmed Native Americans, religious minorities, and those who refused to take a loyalty oath. See *Jackson*, -- F.4th at *5. This led the *Jackson* court to conclude "history demonstrates that there is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons." *Id.* at *6. The Third Circuit panel that originally heard *Range* agreed that section 922(g)(1) was constitutional but came to that determination because people "whose criminal records evince disrespect for the law are outside the community of law-abiding citizens entitled to keep and bear arms" and therefore the regulated conduct was not covered by the Second Amendment's plain text. See 53 F.4th 262, 273 (3d. Cir. 2022), *vacated for rehearing*, 56 F.4th 992 (3d. Cir. 2023). Then on rehearing, a divided *en banc* Third Circuit reversed course and decided that the history and tradition of the Second Amendment did not support the disarming of a nonviolent felon.

There is much more that one could say about these other circuit court opinions (not to mention countless thoughtful district-court opinions from courts around the country) and how they approached the analysis required by *Bruen*. Four outcomes in four cases demonstrates just how inconclusive this project will prove to be. The information available to us (inevitably filtered through the lens of each individual

historian) does not reveal a definitive and original public meaning of the Second Amendment. All we can do is to consult the public record, discern the generally applicable principles, and avoid unnecessary reliance on statutory minutiae. My own effort to do so convinces me that the pre-constitutional understanding of the right to keep and bear arms memorialized in the Second Amendment came with an understanding that the right existed only as to those arms "suitable to their conditions and as allowed by law." Eng. Bill of Rights, *supra.*

Further to that point, modern society has the same need as 17th-century England and 18th-century America to restrict the right to keep and bear arms when a person ceases to be one of the law-abiding citizens entitled to have weapons for self-defense, hunting, and other lawful uses. For example, looking at 18 U.S.C. § 922(g)(8), which bars gun possession for a person subject to a court-imposed domestic-violence restraining order, we can easily see that Congress rationally concluded that such a person is not part of the law-abiding community of citizens. Reports indicate that 85 percent of intimate partner violence victims are women and that this type of violence results in nearly 1,300 deaths a year. See Emory University School of Medicine Nia Project, Domestic Violence/Intimate Partner Violence Facts, https://psychiatry.emory.edu/niaproject/resources/dv-facts.html. The National Coalition against Domestic Violence estimates that in 2018, 1,014 women were killed by male intimate partners. National Coalition Against Domestic Violence, Domestic Violence & Firearms 1 (2022) https://assets.speakcdn.com/assets/2497/guns_and_dv_2022.pdf. The Second Amendment leaves room for legislatures to take these facts into account, not as a matter of means/end scrutiny but as a matter of

solving modern problems of lawlessness, with the same stat-
utory tools—including categorical disarmament—that gov-
ernments in this country used in the 18th and 19th centuries.

## IV

As this brief discussion has shown, the right to keep and
bear arms always has been subject to careful limitations.
These limitations are at their zenith when applied to people
who are the antithesis of the law-abiding citizen who wants
to exercise his or her right to self-defense, whether at home or
in public, and who may also enjoy the various sports and
other activities that involve guns. Even under the English
Declaration of Rights, no one thought anything of disarming
people who were not loyal to the Crown, or who had commit-
ted serious crimes (called felonies), or who had abused their
gun rights (often by poaching on lands to which they had no
right). This history and tradition follows an unbroken line
from long before the Constitution was written, through the
17th and 18th centuries up to the present day.

If anything is clear, it is that the legislature (first Parlia-
ment, and later Congress and the state bodies) was empow-
ered to regulate guns through categorical restrictions. Some-
times they exercised that power; sometimes (as with the
surety laws) they chose to operate on an individualized basis.
The choice between one mechanism or the other is a classic
legislative option. Courts should not, in the name of the Sec-
ond Amendment, be making that choice themselves.

If today's panel were to undertake the thorough historical
analysis that *Bruen* demands, I would be happy to delve even
more deeply into these materials. But I am fully satisfied,
based on what I have addressed here and on the Supreme

No. 22-1557                                          41

Court's own use of history in *Bruen*, that 18 U.S.C. § 922(g)(1) is constitutional as written. I therefore would not remand this case to the district court. I would instead affirm its judgment and uphold the statute.